# Illinois Official Reports

## Appellate Court

---

*People v. Cruz*, **2021 IL App (1st) 190132**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEONEL CRUZ, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-19-0132 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-CR-09676; the Hon. Nicholas R. Ford, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert L. Rascia and Liam Kelly, of Law Offices of Robert Louis Rascia, Ltd., for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Ashlee Cuza, and Andrea V. Salone, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1     Defendant Leonel Cruz stabbed Melvin Perkins during a fight on a Chicago Transit Authority (CTA) bus. He never denied as much but claimed he did so in self-defense. A jury rejected the self-defense claim and found him guilty of aggravated battery.

¶ 2     Defendant says the State failed to disprove his self-defense claim beyond a reasonable doubt. He challenges the jury's verdicts—one conviction and one acquittal, on alternative theories of aggravated battery—as inconsistent. He claims the trial court erred by expressing favoritism for the prosecution and improperly communicating an opinion about the evidence to the jury. And he says his attorney was ineffective for failing to introduce Perkins's recent aggravated assault case as evidence of Perkins's propensity for physical aggression. We affirm.

¶ 3                                    BACKGROUND

¶ 4     A security video from the CTA bus captured much of the incident and speaks definitively to several key factual questions. But not all factual questions. The recording lacks audio, and it is too grainy, and at times too obstructed, to depict everything that transpires between defendant and Perkins. The gaps in the video evidence were filled in by testimony from defendant, Perkins, and the bus driver, Gwendolyn Kendricks. The only other passenger who witnessed the fight passed away before the trial. Collectively, the video and testimony established the following.

¶ 5     Defendant got on the bus and walked past Kendricks without paying his fare. Kendricks told him to tap his pass. Defendant retorted that she was "doing too much" and needed to "chill" and that he was going to pay in due course. According to Kendricks, defendant seemed angry and upset. He may have complained that the bus was late, although he denied it. Perkins heard defendant yelling at Kendricks from his seat in the back of the sparsely occupied bus.

¶ 6     Defendant lingered in the front of the bus while another passenger boarded, paid her fare, and talked to Kendricks for a moment. Defendant then emphatically, and somewhat brusquely, slapped his pass against the scanner. He took his seat toward the middle of the bus, a couple of rows in front of the rear exit.

¶ 7     Defendant testified that Kendricks kept complaining aloud about him after he took his seat, but he ignored her. Kendricks said it was defendant who would not let it go; he kept arguing, telling her she was "doing too much," and calling her names from his seat. Perkins said much the same: Defendant was verbally aggressive and disrespectful toward Kendricks, calling her "bitches, ho's." Kendricks did not recall these particular slurs, but she was routinely called all sorts of things, on her route through some rough-and-tumble neighborhoods, and she had learned to let the invective "roll[ ] right off" of her.

¶ 8     Minutes later, as the bus approached his destination, Perkins pulled the cord to request a stop and walked to the front of the bus. He looked intently at defendant. As he passed by, he turned his head and continued to look back at defendant. But Perkins did not say anything at the time. Neither did defendant.

¶ 9     Perkins figured that Kendricks could use some "words of encouragement." So he wished her "a good day." And he commented that "it was people like [defendant] that continue to disrupt service." Kendricks vented that she had been dealing with such "crazy" people all day.

¶ 10   Defendant overheard enough of their conversation to know that they were talking about him. And he evidently bristled at the thought. As Kendricks recalled, defendant objected that she was "still up there flapping" about him. Defendant denied saying anything to Kendricks. But the video shows Kendricks and Perkins both turning back toward defendant and saying something, as if in response to him. In particular, they testified, they both told defendant that they were not talking to him. Perkins's demeanor at this time, as depicted in the video, suggests that he took a forceful tone with defendant. And more importantly, while he was talking, Perkins took his first steps toward defendant.

¶ 11   The situation quickly escalated from there. Perkins advanced toward defendant, who, in turn, stood up and walked toward Perkins. The video confirms that Perkins was on the move before defendant stood up. And Perkins acknowledged as much on cross-examination: "I walked that way first before [defendant] stood up."

¶ 12   After his first step or two, Perkins paused for a moment to take off his hat. Defendant took the gesture as confirmation that Perkins was coming to fight, right then and there. For his own part, defendant left his backpack in his seat. Perkins described the impending confrontation as "a mutual thing."

¶ 13   Defendant and Perkins stood face to face in the aisle. But it did not come to blows just yet. After a few seconds, Perkins backpedaled and returned to the front of the bus. Defendant went back to his seat.

¶ 14   Defendant testified that he told Perkins to back off. Perkins testified that he backed off because defendant brandished a knife. More specifically, defendant had his hand on a knife that was halfway out of the right front pocket of his pants. It was unsheathed, and Perkins could see some of the blade.

¶ 15   Defendant acknowledged that he carried a pocketknife for protection. He often worked past midnight (as a cook), rode three buses through some rough neighborhoods to get home, and had been jumped on the bus before. Defendant also acknowledged that the knife was in the right front pocket of his pants, with at least part of the handle sticking out, and that he had his hand in that pocket when he confronted Perkins. But the knife remained sheathed for the time being; he did not deliberately brandish it, he claimed, as Perkins implied.

¶ 16   Kendricks also testified that she saw defendant with his hand in his pocket at that time. But she did not see a knife. She did hear defendant ask Perkins, "Is there a problem?" It seemed to Kendricks that defendant "wanted to go elsewhere with it."

¶ 17   The video does not definitively settle whether defendant brandished the knife, but it does clearly show that he put his hand in or right next to his pocket as he stood up and walked toward Perkins. For most of the ensuing confrontation, defendant's hand is obscured by Perkins, but when they part ways and defendant's hand becomes visible again, it is still right next to the pocket where, by his own admission, he had his knife.

¶ 18   A still photo, derived from the video, captured an image of defendant as he got up from his seat and stepped into the aisle. Defendant's hand is clearly next to his pocket and appears to be grasping an object. Although the photo, like the video, is rather grainy, the image is, at the very least, consistent with Perkins's claim that defendant's hand was on the knife.

¶ 19   The police searched the bus after the incident and found the sheath on the floor, in the front of the bus—in exactly the spot where defendant and Perkins would later fight and where defendant claimed he eventually unsheathed the knife and stabbed Perkins with it.

¶ 20    When he returned to his seat, defendant put on his backpack and walked to the rear exit of the bus. Up in the front, Perkins told Kendricks that defendant had a knife. (Or possibly a gun, as Kendricks remembered it.)

¶ 21    All the while, defendant and Perkins continued to exchange words. Perkins testified that defendant "shouted" at him and announced his intention to get off the bus. From Perkins's point of view, that registered as a threat: Defendant "was going to follow [him] with the knife, so [he] was afraid." According to defendant, he told Perkins that, if they were going to fight, they should do it outside, not on the bus.

¶ 22    Indeed, defendant viewed a fight as all but inevitable. As he testified, "by the way it was happening, we were going to fight outside." Expecting Perkins to get off the bus imminently, defendant decided to get off, too, even though this was not his stop. With Perkins near the front exit, defendant's first instinct was to use the rear exit, where he initially stood after putting on his backpack. But then defendant "changed [his] mind" and decided to use the front exit. So he walked to the front of the bus, where Perkins was still standing.

¶ 23    As depicted on the video, defendant grabbed on to several support posts as he made his way up the aisle. His hands were visible, away from his pocket, and clearly empty. He was not, in other words, brandishing his knife at that time.

¶ 24    Defendant and Perkins came face to face in the front of the bus. Perkins looked down toward defendant's pocket. Kendricks testified that defendant had his hand in his pocket at some point during his initial approach and that Perkins asked him, "What do you have?"

¶ 25    Perkins testified that he was afraid defendant would use the knife against him, and he took immediate action to prevent that from happening. To this end, Perkins "grabbed [defendant] so he wouldn't reach for the knife to hold it up and attack me with it." (Perkins implied, in other words, that defendant did *not* already have the knife in his hand as he approached, although the State, both at trial and on appeal, would tell the story differently.) The two began to wrangle.

¶ 26    Perkins immediately got the upper hand. It took him three seconds to wrestle defendant to the floor and pin him down. While on top of defendant, Perkins reached for defendant's right hand, in what appears to be an effort to restrain it. A couple seconds later, Perkins threw two punches at defendant's face. The whiplash motion of defendant's head suggests that the blows landed and forcefully so.

¶ 27    Perkins testified that, by the time he threw these first punches, defendant had managed to get his knife in hand. Defendant claimed otherwise. The video shows that defendant's hand was in or right next to his pocket for much of this initial bout of the fight, but it does not definitively settle the question whether defendant got control of the knife or whether he was merely trying, but failing, to do so at that time.

¶ 28    In any event, Perkins testified that he was "trying to disarm" defendant the whole time. He was scared that defendant would eventually use the knife against him, and he started hitting defendant "out of panic."

¶ 29    Defendant and Perkins continued to wrangle on the floor. For the next 40 seconds or so, the video, due to its angle and various obstructions, provides only limited information about the fight. But from what the video does show, neither defendant nor Perkins managed to fully stand up during this stretch of the fight. For a few seconds, they got their feet partially planted, only to wrestle each other back to the floor. And Perkins appears to retain the upper hand,

though defendant does prove difficult to subdue once and for all. It is not clear whether Perkins managed to throw any more punches just yet.

¶ 30    The fight comes clearly back into view about 40 seconds after Perkins threw his initial punches. Perkins was on top of defendant, whose back was pinned to the floor. Perkins threw a number of forceful punches, in quick succession, at defendant's face. At least three are clearly visible, though there may have been more. Defendant estimated that Perkins landed upwards of six punches, in total, to his face. Defendant also claimed that Perkins bit him on the chest while he was pinned down, though Perkins denied doing so.

¶ 31    If defendant did not have control of his knife sometime earlier in the fight, he did now. Within the next few seconds, defendant's arms appear to move toward Perkins in what might be described as jabbing motions, although the video is not as clear as one might wish. In any event, Perkins identified that as the moment when defendant stabbed him in the chest, and that fact has never been disputed.

¶ 32    After he was stabbed in the chest, Perkins got to his feet, briefly stumbled backwards, and quickly regrouped. Defendant also got to his feet. Perkins and defendant advanced on each other, and Perkins immediately reached for defendant's right hand as they began to tussle again. It is fairly clear from the video that defendant had the knife in his right hand at this point.

¶ 33    Perkins wrestled defendant onto a seat, and after the other passenger helped him restrain defendant, Perkins was able to break free from the struggle. When Perkins disengaged, defendant was clearly holding the knife in his left hand.

¶ 34    Perkins and defendant both got off the bus. They did not fight any further.

¶ 35    Perkins testified that defendant stabbed him twice—in the chest and in the shoulder. The stipulated testimony from the emergency physician who treated Perkins confirmed that this was the case. As for when the shoulder wound was inflicted, Perkins testified that it happened before the chest wound. But he also testified that it was "[w]hen we was standing up tussling *** with the knife." During that round of tussling, he said, defendant "switched one hand and switched the knife to the other hand, stabbed me in my shoulder." That description of events strongly suggests that defendant stabbed Perkins in the shoulder after stabbing him in the chest—after, that is, they got to their feet and reengaged for another round of fighting.

¶ 36    Defendant did not recall exactly when, where, or how many times he stabbed Perkins. All he remembered was stabbing him, at some point after Perkins had dealt him a beating, in what he claimed was an act of self-defense—what he considered to be his "only way out."

¶ 37    The jury was instructed on self-defense. It was also instructed on the State's theory that defendant was the "initial aggressor" in the confrontation and thus was not justified in using force against Perkins. The State argued that defendant committed various acts of aggression before Perkins first resorted to physical force, including this: Defendant approached Perkins (the second time) after he had brandished a knife and announced his intention to fight once they got off the bus. That left Perkins with two choices: Wait for defendant to turn overtly violent or take immediate action to prevent defendant from stabbing him. And it was "reasonable," said the State, for Perkins to choose the latter option in these circumstances.

¶ 38    The jury found defendant guilty of aggravated battery based on causing Perkins great bodily harm but not guilty of aggravated battery based on the use of a deadly weapon. The trial court sentenced defendant to two years of intensive probation and ordered him to complete an anger management class and pay restitution to Perkins.

¶ 40                                        I

¶ 41    Defendant first argues that the State failed to disprove his claim of self-defense beyond a reasonable doubt.

¶ 42    Once a defendant raises an affirmative defense of self-defense, the State has the burden of disproving the defense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 50. In reviewing the sufficiency of the evidence in a self-defense case, we ask whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt that the defendant did not act in self-defense. *Id.* ¶ 51; see *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

¶ 43    It is the jury's job to resolve any conflicts in the evidence. *Gray*, 2017 IL 120958, ¶ 51. We defer to the jury's findings on the credibility of witnesses and the reasonable inferences to be drawn from the evidence, but those findings are not conclusive. *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 44    Whether defendant acted in self-defense or as the "initial aggressor" in the conflict is a factual question, with all the deference to the jury it entails. *People v. De Oca*, 238 Ill. App. 3d 362, 367 (1992).

¶ 45    The elements of self-defense include (1) a threat of unlawful force against the defendant, (2) that the defendant was not the aggressor, (3) that the danger of harm was imminent, (4) that the defendant's use of force was necessary, (5) that the defendant actually and subjectively believed there was a danger that required him to use the force that he used, and (6) that the defendant's belief was objectively reasonable. 720 ILCS 5/7-1 (West 2016); *Gray*, 2017 IL 120958, ¶ 50.

¶ 46    Focusing on the second element, defendant says that Perkins was the aggressor in the fight. He offers two principal reasons why the State, in his view, failed to disprove this element of his defense.

¶ 47    First, the evidence shows that Perkins was the first to make physical contact. That much is undeniably true and has never been in dispute. The security video alone is decisive proof of this fact, one that Perkins himself admitted in his testimony. And the video also confirms that defendant was not brandishing his knife at that time, as he approached the front of the bus, where Perkins grabbed him and initiated the fight.

¶ 48    But these facts, important as they are, do not necessarily establish that Perkins was the aggressor and that defendant stabbed him in self-defense. For one, the first person to resort to physical force is often but not *always* deemed the aggressor. A person may be the "initial aggressor" in a conflict if, as the jury was instructed here, he "initially provoke[d] the use of force against himself." Illinois Pattern Jury Instructions, Criminal, No. 24-25.09 (4th ed. 2000) (hereinafter IPI Criminal 4th).

¶ 49    One of the State's theories of such "provocation," making defendant the initial aggressor, went as follows: Defendant brandished a knife during the first confrontation with Perkins. Soon after that, he announced his intention to fight Perkins when they got off the bus. He then walked right up to Perkins at the front of the bus, with his knife accessible, at the least. This left Perkins with two choices: Wait for an armed defendant to resort to violence, as he had just announced his intention to do, or take immediate action to prevent defendant from stabbing him. In the

State's view, it was "reasonable" for Perkins to choose the latter option, to protect himself from defendant's threat of an imminent attack.

¶ 50     Thus, while Perkins may have been the first to use physical force, he did so in self-defense, since defendant's conduct made him reasonably fear an imminent knife attack. Which means that defendant was the initial aggressor.

¶ 51     Not so, says defendant, because the evidence did not establish that factual scenario—the testimony of the State's witnesses, regarding the events that led up to and precipitated the fight, was "so full of contradictions and discrepancies that it was unworthy of reliance."

¶ 52     In particular, defendant takes aim at the State's evidence that he brandished his knife during the initial confrontation. Defendant argues that, although Perkins may have testified that defendant displayed his knife, Kendricks "directly contradicted" Perkins when she testified that defendant "kept his hands in his pockets." And when defense counsel played the video for Perkins during cross-examination, Perkins acknowledged that—on the video—he could not "see that knife out at all" during the initial confrontation.

¶ 53     We must view the evidence in the light most favorable to the State. And that means we must credit Perkins's testimony, unless no rational person could do so. What Perkins actually said is that defendant had his hand on the knife during the initial confrontation and that the knife was unsheathed and halfway out of the right front pocket of defendant's pants. That is not necessarily inconsistent with Kendricks's recollection that defendant had his hand "in" his pocket—precisely where Perkins said the knife was. If there is any discrepancy between these witnesses' testimony, a debatable point itself, a rational juror could have easily credited the minor discrepancy to the witnesses' different viewpoints: Perkins faced defendant head-on, while Kendrick viewed the action from a distance and at a side angle while driving the bus.

¶ 54     Nor is the security footage, while too grainy to be decisive, necessarily inconsistent with Perkins's account of the initial confrontation. The video makes clear enough that defendant had his hand either inside or right next to his pocket, even if the knife is not itself visible. And the still image derived from the video, depicting defendant as he stood up and stepped into the aisle, shows not only his hand next to his pocket but also an object that he appears to be grasping—one that looks to be consistent with the overall size, shape, and description of the knife.

¶ 55     Thus, a rational juror could find that defendant brandished his knife during the initial confrontation with Perkins. And brandishing a weapon is one way for a defendant to become the initial aggressor in a conflict. See, *e.g.*, *People v. Barnard*, 208 Ill. App. 3d 342, 350 (1991) (pointed gun at victim); *People v. Ellis*, 107 Ill. App. 3d 603, 614 (1982) (brandished gun and fired warning shot into wall to scare victim); *People v. Slaughter*, 84 Ill. App. 3d 1103, 1112 (1980) (brandished knife, which "might constitute an assault," but pause in conflict after knife was brandished required additional inquiry into who was aggressor once conflict resumed).

¶ 56     Indeed, brandishing a weapon may qualify as an act of initial aggression because it is often an assault—it "places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1 (West 2016); see also Ill. Ann. Stat., ch. 38, ¶ 7-4, Committee Comments-1961 (Smith-Hurd 1964) (primary example "of the defendant as the aggressor involve[s] provocation consisting of a direct assault"). (In the appropriate circumstances, of course, brandishing a weapon might not be aggressive or assaultive; it might be a defensive gesture, but defendant is in no position to make *that* claim here, since he denied brandishing the knife at all during the initial encounter.)

¶ 57    After defendant brandished his knife, Perkins backed off and returned to the front of the bus, while defendant went to the rear exit and shouted that he was going to get off the bus with Perkins. That registered with Perkins as a threat to "follow [him] with the knife." Defendant's own testimony hardly dispelled that impression; as he claimed, he told Perkins that if they were going to fight—and tellingly, he was certain that they would—then they should fight outside. Viewing this evidence in the light most favorable to the State, we agree that defendant brandished his knife and followed that up with a threat to use it, sometime soon, against Perkins.

¶ 58    To recap: Defendant brandished a knife, threatened to use it against Perkins sometime very soon, then walked right up to Perkins and got in his face—with his knife accessible, if nothing else. As the two came face to face, Perkins looked down toward defendant's right hand; a still photo shows it dangling right next to the pocket with the knife.

¶ 59    That is how the situation looked to Perkins. As the State argued to the jury, defendant's conduct left Perkins with the choice of doing nothing until an armed defendant made his next move or taking defensive action now to prevent him from wielding the knife in an attack. Fearing that an attack was indeed imminent, Perkins chose the latter course. He grabbed defendant, and the two started to fight.

¶ 60    A rational juror could have found that defendant "initially provoke[d] the use of force against himself." IPI Criminal 4th No. 24-25.09. Which means a rational juror could have found defendant to be the initial aggressor. As long as that is a rational finding, it is a finding we must uphold.

¶ 61    We acknowledge the existence of competing inferences here. The video confirms that defendant did not have a knife in his hand as he walked up to the front of the bus to accost Perkins, and the evidence suggests that defendant was not interested in the bus as the preferred location for the fight; he wanted to fight off the bus. One might take from this that Perkins's actions were premature, before there was a genuine need for defensive action, and thus *Perkins* was the aggressor. But the jury found otherwise, and the existence of competing inferences is not a reason to upset rational findings by the jury.

¶ 62    Because defendant was the aggressor when the fight broke out, he could not claim to be acting in self-defense when he stabbed Perkins—not unless the tables turned, so to speak, and Perkins assumed the role of the aggressor himself, sometime during the fight. To be sure, the role of aggressor can change hands mid-conflict, permitting the initial aggressor to use reasonable force to defend himself. See 720 ILCS 5/7-4(c) (West 2016); IPI Criminal 4th No. 24-25.09. But defendant makes no such argument here. Indeed, his challenge to the evidence is little more than a generalized claim that the State's witnesses were inconsistent and unreliable, coupled with not a single citation of case law concerning the nuances of self-defense. So we need not say more here. A rational juror could find that defendant was the aggressor when the fight broke out and that the role of aggressor did not shift to Perkins before defendant stabbed him. There was sufficient evidence to disprove defendant's claim of self-defense beyond a reasonable doubt.

¶ 63                                                    II

¶ 64    The jury considered two counts of aggravated battery. One count alleged that defendant knowingly caused great bodily harm by stabbing Perkins. The other count alleged that he

caused bodily harm (but not necessarily great bodily harm) by stabbing Perkins and that he committed the battery with a "deadly weapon," namely, a knife.

¶ 65 The jury found defendant guilty of aggravated battery based on causing Perkins great bodily harm but not guilty based on the use of a deadly weapon. Defendant argues that his conviction on the one count of aggravated battery must be reversed because it is "legally and factually inconsistent" with his acquittal on the other count.

¶ 66 Defendant acknowledges that an inconsistency between a conviction and an acquittal is generally not a basis for reversal. See *United States v. Powell*, 469 U.S. 57 (1984); *People v. Jones*, 207 Ill. 2d 122 (2003) (adopting *Powell*). Defendant asks us to depart from *Jones* or carve out an exception to it.

¶ 67 But we need not consider doing so for the simple reason that the verdicts here were not inconsistent. Verdicts are inconsistent " 'when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist even though the offenses arise out of the same set of facts.' " *People v. Price*, 221 Ill. 2d 182, 188 (2006) (quoting *People v. Frieberg*, 147 Ill. 2d 326, 343 (1992)). Thus, verdicts generally are not inconsistent when, as here, the charges have different elements. *People v. Gorka*, 374 Ill. App. 3d 85, 90 (2007).

¶ 68 Here, defendant's jury could have split the verdicts as it did by finding (1) that defendant caused Perkins great bodily harm by stabbing him with his knife but (2) that the knife was not a "deadly weapon." After all, one can cause great bodily harm with all sorts of items that we do not ordinarily consider deadly weapons—one's bare hands, for example. And it does not matter whether anyone agrees with the jury's determination about the status of defendant's roughly four-inch pocketknife. The point is simply that the second count of aggravated battery required the jury to make a finding that the first count did not. Thus, the guilty and not-guilty verdicts, based on alternative theories of aggravated battery, were not inconsistent.

¶ 69                                                     III

¶ 70 During deliberations, the jury sent a note to the trial court asking "[c]an we see evidence the defendant lunged at victim during fight[?]" The court interpreted this as a request to watch the security video. The court granted the request, thus understood, and, without objection from either party, brought the jury out to the courtroom to watch the video. (There were technical obstacles, mentioned earlier on the record, to setting up the video in the jury room.) The court played the entire video for the jury, starting from the moment defendant first got on the bus.

¶ 71 In responding to the note in this fashion, defendant argues, the trial court improperly, if inadvertently, expressed a view to the jury on a disputed question of fact. In particular, the court implicitly communicated to the jury that the video proved defendant *did* lunge at Perkins during the fight. And, by the same token, the court implicitly endorsed the jury's reference to Perkins as a "victim" of defendant's conduct.

¶ 72 The trial court's decision as to whether and how to respond to the jury's request to view evidence is reviewed for an abuse of discretion. *People v. Hollahan*, 2020 IL 125091, ¶ 11. The key question is whether the court's response, if any, expressed an opinion about the evidence that was likely to sway the jury's verdict and thus infringed on the jury's role as the sole trier of fact. *People v. Reid*, 136 Ill. 2d 27, 39 (1990); *People v. Hasselbring*, 2014 IL App (4th) 131128, ¶ 47; *People v. Banks*, 281 Ill. App. 3d 417, 422 (1996).

¶ 73       Defendant does not allege that the trial court erred in allowing the jury to watch the video at all. The problem, he says, is that the "context" in which it was played implicitly conveyed to the jury the court's opinions about what the evidence showed and what conclusions it supported. As we understand defendant's argument, there are two aspects of the "context" that make this the case—and that demonstrate plain error, under either prong of the rule.

¶ 74       First, the court responded to "a general request for proof of a disputed fact" by showing the jury "a curated selection of evidentiary material" that the jury did not expressly ask to see. In other words, the jury made an open-ended request for any available proof that defendant lunged at Perkins during the fight. The trial court responded by culling through the evidence, selecting the video on its own initiative, and presenting it as the requested proof.

¶ 75       We cannot accept defendant's characterization of the video as a "curated" selection of evidence, handpicked and implicitly endorsed by the trial court as just the proof the jury was looking for. The trial court did not, in any meaningful sense, pick and choose which evidence to show the jury. It is true, as defendant says, that the jury did not explicitly ask to watch the video. But what other evidence could the jury, in its own way, have been asking to see?

¶ 76       The nontestimonial evidence consisted of the video, still photos captured from the video, crime-scene photos, defendant's knife and its sheath, and the stipulation from the physician who treated Perkins. All this evidence—other than the video—was sent back with the jury when it began deliberating. (The court did not send back the video with the rest of the evidence because, as we noted, there was a technical obstacle to setting it up in the jury room.) Thus, there was *nothing but* the video that the jury could have been asking to see. It already had everything else.

¶ 77       So why did the jury not just ask to see the video? We cannot pretend to know for sure, and ultimately, there may not be any good reason why the jury phrased the request as it did. But one possibility is that the jury only wanted to see certain part(s) of the video, namely, those in which defendant might be described as "lunging" at Perkins. The trial court, to its credit, did not try to guess which part(s) of the video the jury may have had in mind. The court played the video in full, without selecting, omitting, or drawing the jury's attention to any particular part(s) of it. If the court had done any of *that*, it would have been "curating" the evidence. And then we would have to decide whether the court's editing may have implicitly characterized the evidence or otherwise colored the jury's perception of it in some way that was damaging for the defense.

¶ 78       But that is not what the trial court did. Instead, the court simply allowed the jury to view the only piece of evidence it did not already have at its disposal, while letting that evidence speak for itself. For all that defendant has said so far, there was no reason for the jury to think that the judge was expressing an opinion, implicitly or otherwise, about any factual dispute.

¶ 79       Second, defendant argues that the trial court should have admonished the jury that the video might or might not show defendant "lunging" at Perkins and that Perkins, at this juncture, was not a "victim" in the eyes of the court. These were the jury's own words, not the court's, but defendant argues that the trial court's failure to openly disavow them had the effect of implicitly endorsing them.

¶ 80       It would have been easy enough for the trial court to admonish the jury along these lines before playing the video: "The court has interpreted your note as a request to watch the security video. It will be played for you in full. It is for you alone to decide whether it shows defendant lunging at Mr. Perkins during the fight and whether Mr. Perkins was the victim of any crime

committed by defendant." And when a jury note arguably expresses some characterizations or conclusions regarding the evidence, the best practice will often be for the trial court to openly refrain from endorsing them. But the absence of some such admonishments is not reversible error unless it creates a substantial risk of conveying to the jury that the judge held some view of the evidence that was unfavorable to the defense.

¶ 81    The suggestion here is that the jury would have been all too likely to draw this inference: "We used the phrase 'lunged,' the judge said nothing in response, so the judge agrees that defendant lunged at Perkins during the fight." We see little risk that the jury would even notice, much less draw any damaging conclusions about defendant, from the court's silence about its use of this phrase in the note.

¶ 82    For one, the disputed question of fact in this case was whether defendant stabbed Perkins in self-defense and not, as defendant sometimes says, whether he "lunged" at Perkins during the fight. To the contrary, there is at least one moment in the fight when it is all but impossible to deny that he did lunge at Perkins—when the two got to their feet and reengaged after defendant stabbed Perkins in the chest. But that does not settle the question of self-defense one way or the other.

¶ 83    Defendant seems to equate, or assumes that the jury would have equated, "lunging" with guilt, as if to say that "lunging" necessarily connotes an offensive act. Granted, in *some* sense it does; if nothing else, it conveys the idea that one is actively moving toward the opposition, not passively awaiting the opposition's move. But that does not mean that one cannot lunge at the opposition in an act of self-defense. One might, for example, lunge at an aggressor in an effort to disarm him. Indeed, it would not be totally unfair to describe Perkins as lunging at defendant when the fight first erupted. But that does not mean Perkins was not acting reasonably, to protect himself from defendant's threatening conduct—as the State argued and as the jury could reasonably conclude, as we explained above.

¶ 84    We are not convinced that the jury meant the phrase "lunged" to be anything more than a matter-of-fact description—as opposed to a legally freighted description—of defendant's actions. And so we find it unlikely that the jury would have inferred anything at all from the trial court's failure to disavow this description, assuming that the jury would have even noticed in the first place. Even less do we think the jury would have inferred, from the court's silence on this matter, that the judge must have viewed defendant as guilty.

¶ 85    Defendant also argues that the jury was all too likely to draw a similar inference from the court's failure to disavow the note's reference to Perkins as the "victim." For reasons like those we have already given, this inference strikes us as equally unlikely. And as we found with the jury's use of the word "lunged," we do not think the use of the word "victim" is legally freighted in the way defendant seems to assume.

¶ 86    In one sense—a technical legal sense—of the term, to call Perkins the "victim" is to say that defendant committed a criminal act, not a justified act of self-defense, against him. Which is just to say that defendant was guilty.

¶ 87    But that is not the only use of "victim" in the English language. More broadly, the phrase means "one that is injured, destroyed, or sacrificed under any of various conditions." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/victim (last visited July 2, 2021) [https://perma.cc/5GJT-KPUR]. In referring to Perkins as the "victim," the jury may have simply meant "the guy who was injured, badly hurt, stabbed, during the fight."

¶ 88    And that is the more natural and likely interpretation of the note. If the jury had already concluded that Perkins was a "victim" in the technical legal sense, which implies that defendant committed a crime against him, one would expect the jury to sign the verdict forms, not ask for another look at a key piece of evidence. This is all the more reason to doubt that, from the jury's perspective, the trial court implicitly suggested that defendant was guilty.

¶ 89    For these reasons, we cannot conclude that the trial court erred at all, much less that it committed the kind of "clear or obvious" error required on plain-error review. See *People v. Birge*, 2021 IL 125644, ¶ 24.

¶ 90                                         IV

¶ 91    Defendant argues that the trial court's "unsolicited comments" communicated to the jury that the judge was "personally sympathetic to the prosecution" while holding defense counsel in "some measure of disdain." These comments "invited the jury" to "entertain negative opinions" of its own about counsel.

¶ 92    Two of these "unsolicited comments" were requests for Perkins to clarify his testimony during defense counsel's cross-examination. The first was this:

> "Q. As [defendant] was going to the back of the bus, I was already in the front of the bus. There is no audio [on the security video]. He was threatening me, telling me he was going to get off the bus.
>
> Court: What does that mean, "threatening me, telling me." Say the words that he said.
>
> A. He told me guess where I'm fitting to get off at, indicating that he's getting off where I'm getting off at to case me with the knife is what I took—"
>
> (At which point defense counsel posed another question.)

¶ 93    The second comment, in its full context, was the following:

> "Q. Just for the record, the defendant, male Hispanic, Cruz, whatever you want to say at this point, he never threatened the bus driver, did he?
>
> A. I mean, in so many words, yes.
>
> Q. Excuse me, Mr. Perkins, did he say anything to the bus driver like I'm going to get you, I'm going to attack you, I'm going to do something to you?
>
> A. He was disrespecting her, calling her a B—
>
> Court: Say the words—say the words that you heard, if you did.
>
> A. Okay. He was calling her bitches, ho's like, he was just talking to her disrespectful."

¶ 94    The Rules of Evidence provide that the trial court "may interrogate witnesses." Ill. R. Evid. 614(b) (eff. Jan. 1, 2011). Provided, of course, that the judge does not "assume[ ] the role of prosecutor" in so doing. (Internal quotation marks omitted.) *People v. Harris*, 384 Ill. App. 3d 551, 561 (2008). The court may pose any questions, in a fair and impartial manner, that help "elicit the truth" or "clarify[ ] any ambiguities" in the testimony. *People v. Johnson*, 327 Ill. App. 3d 203, 205 (2001). The court does not take on an improper adversarial role just because its questioning elicits evidence that is material to the prosecution's case. *Harris*, 384 Ill. App. 3d at 561. The manner of any such questioning is left to the trial court's sound discretion. *Id.*

¶ 95    In requesting clarification from Perkins, the trial court did not, on either occasion, take on an improper adversarial role or, as defendant asserts, express personal "disdain" for counsel. The trial court was, in the main, simply asking Perkins to replace his conclusions about the meaning of defendant's words—namely, that defendant threatened him and Kendricks—with defendant's actual words, to the extent that Perkins may have heard them. The court was also asking Perkins to clarify what he meant when he said that defendant called Kendricks a "B—."

¶ 96    With those clarifications in hand, the jury could then decide for itself whether defendant threatened anyone and whether it was reasonable for Perkins to feel threatened by anything that defendant said. And for all the trial court knew, Perkins's conclusions about defendant would not hold up very well once he explained what defendant actually said. For these reasons, the trial court's questions strike us as straightforward and proper efforts to elicit facts and clarify testimony (see *Johnson*, 327 Ill. App. 3d at 205)—and not to intentionally bolster the State's case, applaud the prosecutors, or throw shade on defense counsel.

¶ 97    Next, defendant takes issue with a remark the trial court made while sustaining an objection during defendant's direct examination:

> "Q. Well, let me ask you this question: While all of this is going on [namely, getting pinned down and punched by Perkins], did you have a chance to think at all?
>
> A. No.
>
> Q. All you know—let me put it this way: Everything you were saying, everything you were doing was at this point by instinct?
>
> A. Yes.
>
> State: Objection.
>
> Court: Sustained. That's the kind of thing he says, not you, [counsel]. Let him testify, please."

¶ 98    To begin, defendant does not, and cannot reasonably, argue that the trial court improperly sustained the State's objection. Counsel, to put it gently, was leading the witness on direct examination. More bluntly, counsel was putting words in defendant's mouth. So after sustaining the State's objection, the trial court reminded counsel that any such characterization of defendant's conduct and state of mind would have to come from defendant himself.

¶ 99    In the course of that explanation, the trial court did not express any personal animus or unduly "chastise" defense counsel. A trial judge may, from time to time, express some measure of irritation with defense counsel's conduct, while still remaining impartial and affording the defendant a fair trial. See *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). And based on the paper record before us, silent as it is about the judge's tone, we cannot even say that the trial court did *that* much. We see no error here at all.

¶ 100   Defendant's fourth and final complaint pertains to the trial court's reaction when counsel asked defendant, again during his direct examination, if any of his family members were present in court. When counsel posed that question, the trial court admonished counsel and the jury as follows:

> "Counsel, it was irrelevant the first time you did it, and it is still irrelevant.
>
> Folks, remember when I talked to you about sympathy, bias, or prejudice?

- 13 -

All right. What possible significance would the presence of these individuals within the courtroom have on the guilt or innocence of the defendant? None. Yet, the question was asked.

So here is what I want you to remember: The evidence is what we hear from the witness stand. He may or may not have people here. But the case will be decided by you based on the law and the evidence and not who was watching the trial."

¶ 101    Counsel requested a sidebar and objected to the court's refusal to allow questions about the presence of defendant's family in court. Counsel argued that the State was permitted to ask various background questions about Perkins's family, such as whether he had children and so on, and that the pending question was no different. The trial court responded that counsel could ask defendant similar background questions about his own family but asking him to identify people in the gallery who were watching the trial went beyond that. The only reason for doing that, in the trial court's view, was to "solicit some kind of sympathy or bias from the jury."

¶ 102    On appeal, defendant argues that the question was "relatively innocuous" and did not warrant such a "lengthy criticism" of counsel in front of the jury. But the trial court was correct that whether defendant's family was present in court was not relevant and that there was no evident purpose in pointing them out other than to elicit sympathy from the jury.

¶ 103    Was there a hint of irritation or frustration in the trial court's response? Perhaps. (If so, the frustration may have been owing to the trial court's recollection that counsel had used this tactic before. We are not sure when that supposedly happened. It was not at any time during or after counsel's opening statement. But we have not been given a transcript of the jury selection proceedings, where counsel may have referenced the presence of defendant's family.)

¶ 104    In any event, we say again that judicial impartiality and the fairness of the proceedings are not compromised by the slightest expression of frustration at counsel's conduct. See *id.* And the most we can say about the trial court's response to counsel's improper question is that, perhaps, it could have been a bit gentler. That is hardly a basis for granting a new trial.

¶ 105    Because we find no error at all, we need not consider the parties' plain-error arguments.

¶ 106                                                    V

¶ 107    Lastly, defendant alleges that his attorney was ineffective for failing to offer evidence of Perkins's history of physical aggression to support his claim of self-defense.

¶ 108    A defendant who raises a claim of self-defense may offer evidence of the victim's violent or aggressive acts to show that the victim was the aggressor in their altercation. *People v. Lynch*, 104 Ill. 2d 194, 200 (1984). When *Lynch* evidence (as it is called) is offered for this purpose, it functions as character or propensity evidence, rather than evidence of the defendant's state of mind. *Id.* Thus, it is relevant and admissible, to support the defendant's own version of events, whether or not the defendant was aware of the victim's other violent or aggressive acts at the time of the altercation. *Id.*

¶ 109    Perkins was on supervision when he testified at defendant's trial. That disposition arose from a charge of aggravated assault, in a case involving an assault (of some kind) on a police officer. The State elicited Perkins's criminal history during his direct examination, in part because it was impeachment material generally, and in part for the purpose of showing that he did not receive any benefit from the State in exchange for his testimony, and hence that he had no bias or motive to testify against defendant.

- 14 -

¶ 110    At the State's request, the trial court instructed the jury that it could consider Perkins's criminal history only "as it may affect [his] believability" as a witness. IPI Criminal 4th No. 3.12.

¶ 111    We must presume that the jury follows any limiting instructions that it receives. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 75; *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 78; see *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them.").

¶ 112    And when *Lynch* evidence is admitted, the jury should be instructed that it may consider that evidence "in deciding whether the State has proved beyond a reasonable doubt that the defendant was not justified in using the force which he used." IPI Criminal 4th No. 3.12X.

¶ 113    Because defense counsel never sought to introduce Perkins's aggravated assault case as *Lynch* evidence, the jury never received IPI Criminal 4th No. 3.12X. So we must presume that the jury followed the limiting instruction it received in IPI Criminal 4th No. 3.12 and did not consider the evidence as *Lynch* evidence.

¶ 114    The State says that defense counsel made, or could have made, a reasonable strategic decision to let the State front Perkins's history and not pursue the matter further, on the theory that the aggravated assault case was already before the jury and there was more to lose than to gain by pursuing the issue. We cannot accept that argument. If defense counsel wanted the jury to consider the case as *Lynch* evidence, then, at a minimum, counsel had to request IPI Criminal 4th No. 3.12X. By not doing so, counsel gave up that opportunity without getting anything in return. There was simply no reason not to seek that jury instruction.

¶ 115    But in applying the familiar deficiency-and-prejudice framework of *Strickland v. Washington*, 466 U.S. 668, 697 (1984), we may reject a claim of ineffective assistance based on the absence of prejudice alone. We do so here.

¶ 116    Defendant argues that Perkins's aggravated assault case should have been offered as "substantive evidence that Perkins was the initial aggressor in the altercation on the bus." As we noted above, propensity evidence of this kind is admissible and helpful to the defense, when the defendant and the victim offer conflicting accounts of the events—in particular, when each one claims that the other was the first to resort to physical force. A defendant's claim of self-defense will frequently stand or fall based on the jury's resolution of this type of factual dispute.

¶ 117    But *this* fact was not in dispute here. Every available piece of evidence confirmed that it was Perkins who first resorted to fisticuffs. Perkins himself admitted as much. For what it's worth, defendant and Kendricks said so, too. And most importantly, *the jury could see that fact for itself* by watching the video, which leaves no doubt about the matter. A propensity inference about Perkins would have added little or nothing to the jury's deliberations on this particular question. The available evidence already settled the matter definitively.

¶ 118    The real question in this case was whether defendant was the initial aggressor *despite* the fact that Perkins was the first to resort to physical force. In other words, the jury had to decide whether defendant's conduct leading up to the physical confrontation gave Perkins reasonable grounds to respond to defendant with defensive force. There is no reason why a juror should find Perkins's criminal history helpful in assessing defendant's conduct, or even the reasonableness of Perkins's response to that specific conduct. Thus, there is no reasonable probability that *Lynch* evidence would have swung the verdict in defendant's favor.

¶ 119                              CONCLUSION

¶ 120          For these reasons, we affirm the judgment of the circuit court.

¶ 121          Affirmed.