2023 IL App (1st) 200163-U
No. 1-20-0163
Order filed February 27, 2023

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 4555 |
| | ) | |
| MICHAEL BOLDEN, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Lavin and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Affirmed. The circuit court properly dismissed a first-stage postconviction petition alleging ineffective assistance of direct-appeal counsel, as petitioner cannot show counsel's alleged errors arguably prejudiced him.

¶ 2     Michael Bolden armed himself with a sawed-off rifle outside of a busy liquor store and confronted Michael Robinson, who seconds earlier had called him a "snitch." Surveillance footage shows Bolden re-approaching Robinson, rifle drawn; Robinson turning around and dropping to the ground; and Bolden walking away. Bolden shot Robinson in the neck moments after someone hollered to Robinson, "[W]atch out, he got a gun."

¶ 4       At trial, Bolden raised self-defense. Bolden claimed he saw Robinson back up and reach toward his hip. Bolden said that he feared for his life, knowing Robinson to carry a gun and to have committed a violent act. Before trial, the court barred other evidence of Robinson's prior violent behavior along with evidence of a previous conversation between Bolden and another about Robinson. At the close of the trial, the court instructed the jury on self-defense, first-degree murder, and second-degree murder. The jury found Bolden guilty of first-degree murder. On direct appeal, Bolden's counsel failed to challenge the trial court's pretrial orders.

¶ 5       Bolden filed a postconviction petition alleging, in pertinent part, ineffective assistance of appellate counsel. The trial court summarily dismissed the petition. We conclude Bolden cannot show a necessary part of his ineffectiveness claim—that any error arguably prejudiced him—and affirm the summary dismissal.

¶ 6                                     Background

¶ 7                                     Direct appeal

¶ 8                                     Motions *in limine*

¶ 9       Bolden sought to admit as *Lynch* evidence two of Robinson's prior convictions, in addition to the evidence elicited at trial. *People v. Lynch*, 104 Ill. 2d 194, 199-201 (1984) (recognizing admissibility of alleged victim's prior violent behavior in self-defense cases). The trial court barred evidence of these convictions as "too remote and prejudicial" and declined to reverse its ruling on reconsideration. Bolden also sought to admit evidence of a prior conversation at a pool hall that would purportedly explain his state of mind when Robinson called him a "snitch." The court excluded this evidence as impermissible hearsay.

¶ 10                                        Trial

¶ 11                                Surveillance footage

¶ 12     Both parties introduced interior and exterior video camera footage for I+S, a liquor store at the southwest corner of 63rd Street and Carpenter Avenue. This video shows a car parking along Carpenter Avenue around 6:30 p.m. and Bolden and another man leaving the car and crossing Carpenter Avenue, heading to the front door of the liquor store on 63rd Street.

¶ 13     Before entering the store, Bolden clasps hands with Michael Robinson, who pulls his hand above his head. Robinson remains outside. Bolden and the man he rode with enter the store, make a purchase, and exit. Bolden and the other man walk around the corner to the parked car, and Robinson joins them. In the middle of Carpenter Avenue, Bolden and Robinson face one another. Robinson walks back toward the liquor store, putting something in his jacket.

¶ 14     Bolden retrieves a sawed-off rifle from the car. He appears to check it as he walks toward Robinson. Meanwhile, Robinson walks along 63rd Street before stepping flush with the liquor store and turning toward Carpenter Avenue. Bolden soon appears in the same frame, rifle drawn, walking toward Robinson. Although the camera angle partially obscures Robinson, it shows him dropping to the ground. Bolden keeps walking toward Robinson, pivots, jogs toward the car, and gets in the back seat. The other man enters the driver's seat and the car departs.

¶ 15                                State's Case

¶ 16     The State called as witnesses Bolden's cousin, Emerson Watson, and Watson's girlfriend, Lorraine Pickens.

¶ 17     After a stop for Bolden to meet with his tax preparer, Watson, Pickens, and Bolden drove to the liquor store. Watson parked on Carpenter Avenue. Watson did not recall seeing anyone

standing outside the store. Inside, Bolden bought a pint of gin. (A clerk at the store testified Bolden was a regular customer.) Bolden bought cigarettes from someone outside. Watson did not hear or see anything threatening or aggressive.

¶ 18    As Watson was getting back in the car, Bolden opened the back door, where he had been sitting, and reached under the driver's seat for a "small like sort of rifle." Watson had not seen the rifle before. Bolden told Watson to wait and that he better not leave or he would "fire the car up," meaning, shoot at the car. Bolden walked toward the liquor store, and Watson heard a gunshot. After that, Bolden ran to the car, and they drove off. Bolden tried to get Watson to push through a red light, but Watson refused.

¶ 19    Pickens also testified that when Watson and Bolden returned to the car, Bolden retrieved a "big gun" and told her to "shut the f*** up." When Bolden went toward the store, Pickens got out and heard a single gunshot. Bolden returned, saying, "[Y]ou better not leave me. I'm going to fire the fucking car up."

¶ 20    The next day, Bolden called Watson and instructed him to "be cool" and "to keep [Pickens'] mouth shut."

¶ 21    Weeks later, Watson and Pickens hired a lawyer and gave statements to the police.

¶ 22    The State also called as a witness Bolden's tax preparer, Alicia Childress. She testified Bolden called days after the shooting to ask about his refund check and told her that if anybody was there looking for him, they "better aim high."

¶ 23    An autopsy indicated Robinson died of a single gunshot wound to the right side of the neck. There was no forensic evidence of a close-range firing.

¶ 24                                    Defense

¶ 25    Bolden took the stand in his own defense. He first noticed the rifle under the driver's seat after Watson picked him up. Later, as they approached the liquor store, Bolden saw Robinson. Bolden estimated he saw Robinson three or four times a week outside that store.

¶ 26    Bolden went to greet Robinson. Robinson tried to throw Bolden's hand up, but Robinson's hand went up instead. Bolden thought Robinson did not want to greet Bolden as usual because Bolden had snitched on him, though Bolden did not view the failed greeting as a sign of disrespect. Nor was he afraid of Robinson at that time.

¶ 27    When Bolden and Watson left the liquor store, Bolden bought loose cigarettes from Robinson. Bolden and Robinson also talked about "why [Robinson] labeled [Bolden] a snitch." Still, Bolden was not afraid of Robinson.

¶ 28    After they parted, Bolden armed himself with a "large" "sawed-off rifle" with a "clip" and chambered a round. Bolden told Watson that he was going back to "holler at the dude real quick" and talk to him about "what he is accusing me of." Bolden denied telling Watson that he would shoot the car if Watson left.

¶ 29    Bolden walked back toward Robinson "to resolve a matter before it got out of hand." He believed that if he left without addressing Robinson's accusation, the situation "would escalate." He took the rifle for protection because Robinson was "known to have guns."

¶ 30    As Bolden re-approached, Robinson was talking to another person. Bolden heard the person tell Robinson, "[W]atch out, he got a gun." Bolden had the rifle at either his "chest" or "waist." Bolden shot when Robinson backed up and put his hands on his hip. Bolden estimated he was 10 to 12 feet away from Robinson. Bolden believed Robinson was reaching for a gun, and he feared for his life.

¶ 31    Bolden decided to fire a "warning shot." He kept walking toward Robinson because he did not know he had shot him. Bolden denied pointing the rifle at Robinson before seeing Robinson reach toward his hip.

¶ 32    Bolden had intended to talk to Robinson but "didn't get a chance to say anything." He denied threatening to "fire up" the car, telling Pickens to shut up, and telling Watson to drive through a red light. He did not go to the police after the shooting because he was on "parole," and afraid of returning to jail. He recalled seeing Robinson pistol-whip another man in a pool hall weeks before the shooting and, on another occasion, displaying a gun when asking if Bolden had 9-millimeter shells. Bolden had a prior felony conviction for armed robbery.

¶ 33                    Closing Arguments, Verdict, and Post-trial Proceedings

¶ 34    In closing, the State argued Bolden's actions before, during, and after the shooting supported a verdict of first-degree murder. Counsel for Bolden argued Bolden had acted in self-defense and, alternatively, Bolden's belief the need to act in self-defense, though unreasonable, supported a verdict of second-degree murder.

¶ 35    The jury found Bolden guilty of first-degree murder.

¶ 36    In a post-trial motion, Bolden challenged the court's pretrial denials of *Lynch* evidence and of the pool-hall conversation. The court denied that motion. Bolden, as a habitual criminal, received a term of natural life.

¶ 37    On the day of sentencing, Bolden submitted a *pro se* motion for a new trial, raising counsel's ineffectiveness. The motion was stamped "received," but the court did not address the motion.

¶ 38                              Prior appeals

¶ 39    In Bolden's first direct appeal, appellate counsel argued the lack of any inquiry into Bolden's *pro se* claims of ineffective assistance required remand for a *Krankel* inquiry. This court agreed and remanded. *People v. Bolden*, 2015 IL App (1st) 131309-U, ¶¶ 12-18.

¶ 40    On remand, Bolden moved for substitution of judge, arguing that Judge Burns could not fairly rule on the *Krankel* motion. Judge Burns sent the motion to Judge Clay, who refused to rule on the motion. Judge Burns held a preliminary *Krankel* inquiry and denied the motion.

¶ 41    In the second direct appeal, this court remanded, finding Judge Clay erred by refusing to rule on the motion for substitution. *People v. Bolden*, No. 1-16-0240 (2018) (unpublished summary order under Supreme Court Rule 23(c)). On remand, Judge Brosnahan denied the motion, finding no basis for a substitution of judge.

¶ 42    In the third and final direct appeal, this court granted appellate counsel's motion to withdraw as counsel under *Anders v. California*, 386 U.S. 738, 740 (1967). *People v. Bolden*, No. 1-18-2295 (2019) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 43                          Postconviction Proceedings

¶ 44    Bolden's *pro se* postconviction petition raised several issues, and the trial court summarily dismissed the petition as frivolous and patently without merit.

¶ 45                                  Analysis

¶ 46                          Post-Conviction Hearing Act

¶ 47    Bolden petitioned for relief under The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.*). Postconviction proceedings have three distinct stages. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At each stage, petitioners like Bolden bear the burden of showing they qualify for relief. 725 ILCS 5/122-1(a)(1).

¶ 48    Bolden appeals from the summary dismissal of his petition at the first stage. Generally, the trial court summarily dismisses a petition unless it alleges facts stating "the gist of a constitutional claim." See *People v. Allen*, 2015 IL 113135, ¶ 24. This is a low standard; the trial court takes a petitioner's allegations as true and should construe them liberally, unless the record positively rebuts those allegations. *Allen*, 2015 IL 113135, ¶ 25 (citing *People v. Edwards*, 197 Ill.2d 239, 244 (2001)).

¶ 49    Moreover, the trial court should summarily dismiss a petition if its claims have no arguable basis, either in law or fact. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). "No arguable basis either in law or in fact" means it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16. "Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 17. If the record contradicts a petitioner's legal theory, that theory is meritless. *Id.* at 16.

¶ 50    This court reviews the summary dismissal of Bolden's petition *de novo*, giving no deference to the trial court's ruling. *Id.* ¶ 19.

¶ 51                    Ineffective Assistance of Direct-appeal Counsel

¶ 52    On appeal, Bolden focuses on the trial court excluding (i) the balance of the *Lynch* evidence he sought to introduce at trial, and (ii) evidence of a prior conversation at a pool hall that would purportedly explain his state of mind when Robinson called him a "snitch." In addition, he maintains that counsel on direct appeal provided ineffective assistance by failing to raise these issues, which trial counsel had preserved in the post-trial motion. He attached as an exhibit a letter to his first direct-appeal counsel requesting she raise these issues.

¶ 53     To assess whether Bolden received ineffective assistance of counsel, we apply the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting *Strickland*)). Under *Strickland*, a petitioner must show (i) counsel's actions constituted errors so serious as to fall below an objective standard of reasonableness and (ii) absent those errors, a reasonable probability existed that the trial's outcome would have been otherwise. *Strickland*, 466 U.S. at 687, 694; see also *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010) (noting, "[t]he *Strickland* standard applies equally to claims of ineffective appellate counsel").

¶ 54     At the first stage of postconviction proceedings, Bolden needed to show both *arguable* deficiency and *arguable* prejudice. *Petrenko*, 237 Ill. 2d at 496-97 (citing *Hodges*, 234 Ill.2d at 17). We find that Bolden cannot show arguable prejudice because nothing in the record suggests a reasonable probability counsel would have been successful raising these issues on direct appeal. The evidence at trial—including the video, the State's evidence, and Bolden's testimony—overwhelmingly established Bolden did not act in self-defense (perfect or imperfect) when he killed Robinson.

¶ 55     Bolden contends, "[t]he outcome of [his] trial came down to his mindset at the time he fatally shot Michael Robinson." In his view, the two complained-of evidentiary rulings undermined the jury's fair resolution of this core question. The jury needed to know about Robinson's prior conviction for armed robbery because that conviction "would have given the jury the complete picture why [his] fear of [Robinson] was reasonable." Likewise, the jury needed to hear about the prior conversation at the pool hall because, without it, Bolden's decision to arm himself "made little sense."

¶ 56    While Bolden's "mindset" constitutes one critical element of his defense to justify his use of force as self-defense, he had to establish (i) unlawful force was threatened against him, (ii) he was not the aggressor, (iii) the danger of harm was imminent, (iv) the use of force was necessary, (v) he subjectively believed a danger existed that required using force, and (vi) his beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995); 720 ILCS 5/7-1(a).

¶ 57    At trial, Bolden failed to prove that he faced a threat of unlawful force or was not the aggressor. Indeed, his testimony established he was the aggressor. To be sure, Bolden testified he wanted to talk to Robinson and armed himself for his protection, and formed the intent to shoot after he saw Robinson reach toward his hip. Alone, this testimony supports Bolden's self-defense claim. *People v. Everette*, 141 Ill. 2d 147, 157 (1990) (noting, "very slight evidence" properly supports giving jury instruction on given theory of case).

¶ 58    But Bolden recounted more. He testified to not fearing Robinson at any point before the shooting, yet, armed himself with a loaded sawed-off rifle, which he held at his "chest" or "waist" when he re-approached Robinson. And he heard someone holler to Robinson, "[W]atch out, he got a gun." So, what Bolden recounted amounts to aggravated assault. Bolden had "place[d] another in reasonable apprehension of receiving a battery" (720 ILCS 5/12-1(a))—here, being shot while standing on the sidewalk. 720 ILCS 5/12-2(a). Brandishing a weapon is a way to become an aggressor. *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 56. Under these circumstances, it does not follow that Robinson threatened unlawful force. Robinson's reaction would have been a lawful response to the imminent threat Bolden admittedly presented. 720 ILCS 5/7-1(a).

¶ 59    At trial, Bolden also argued second-degree murder, where the facts showed he believed he had to act in self-defense, though his belief was not reasonable. Second-degree murder is a lesser-

mitigated, not lesser-included offense, of first-degree murder with the same elements and required mental state. *People v. Staake*, 2017 IL 121755, ¶ 40; 720 ILCS 5/9-2(a)(1)-(2). To be found guilty of second-degree murder under Bolden's theory, the evidence had to show (i) unlawful force threatened against Bolden, (ii) he was not the aggressor, (iii) imminent danger of harm, (iv) the use of force was necessary, and (v) he subjectively believed a danger existed requiring use of force. *Jeffries*, 164 Ill. 2d at 129. This alternative defense fails; Bolden admitted to brandishing a sawed-off rifle with a clip, prompting Robinson to reach toward his hip.

¶ 60     In sum, Bolden's testimony (i) undermined direct-appeal counsel's ability to challenge complained-of evidentiary rulings, (ii) tracked with footage of the shooting, which showed him re-approaching Robinson and calmly shooting him, (iii) adhered to the forensic evidence showing Robinson died from a gunshot wound to the side of his neck, and (iv) aligned with the threats Watson, Pickens, and Childress recounted him making before and after the shooting.

¶ 61     Given the overwhelming evidence of guilt, Bolden cannot show a necessary component of his ineffectiveness claim—an error arguably prejudiced him. See *Petrenko*, 237 Ill. 2d at 496-97. We hold that the trial court properly dismissed Bolden's petition as frivolous and patently without merit.

¶ 62     Affirmed.