2022 IL App (1st) 200650-U

FIRST DISTRICT,
FIRST DIVISION
July 18, 2022

No. 1-20-0650

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 19 CR 2755 |
| | ) | |
| MARCELL HURLEY, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Hyman and Justice Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated battery is affirmed where the State proved beyond a reasonable doubt that defendant was not acting in self-defense, the trial court did not err in instructing the jury or limiting impeachment evidence, and the prosecutor's use of the term "victim" was not improper.

¶ 2    Following a jury trial, defendant Marcell Hurley was convicted of aggravated battery and sentenced to 29 months' imprisonment for stabbing Keith Sanders during a fight. On appeal, defendant argues that: (1) his claim of self-defense was not disproven beyond a reasonable doubt, (2) the trial court erred in instructing the jury, (3) the trial court erred in allowing insufficient

impeachment evidence against Sanders, and (4) Sanders was improperly referred to as the "victim" during the trial. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4        Defendant was charged with attempt first degree murder and aggravated battery after stabbing Keith Sanders on a Chicago Transit Authority (CTA) station platform the night of February 3, 2019.

¶ 5                                 Pre-trial Motions

¶ 6        Prior to trial, defendant filed a motion *in limine* seeking to admit "evidence of complainant's violent character" pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), based on his affirmative defense of self-defense. Defendant sought to present the testimony of Aurora Police Officer Sean Fancsali, who arrested Sanders for a domestic battery involving his ex-girlfriend on August 4, 2016. At a hearing on the motion, Fancsali testified that Sanders "tried to push his way back" and "scream[ed] that he was going to come back and kill everybody" during his arrest. The trial court granted the motion, finding the evidence was admissible to show Sanders had "aggressive tendencies."

¶ 7        Defendant also sought to impeach Sanders with his three prior felony convictions pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971). The State acknowledged that Sanders's 2017 conviction for domestic battery, 2012 conviction for possession of a controlled substance, and 2010 conviction for escape "come in under *Montgomery*," but argued that introducing all three would be overly prejudicial. The trial court limited impeachment to the domestic battery and possession of a controlled substance convictions, reasoning that the escape conviction "could cause confusion *** that's overly prejudicial, and it outweighs its probative value."

¶ 8                                          Trial

¶ 9          On the night of February 3, 2019, Sanders was on the CTA station platform at Cicero and Lake (Cicero). He had been drinking earlier but was not intoxicated when he got to the station. Sanders "heard some screaming and some cursing" on the platform and saw defendant arguing with a CTA employee. When Sanders told them to "calm down," defendant began walking towards Sanders with his fists "in a fighting posture." Sanders and defendant began fighting, though Sanders does not recall who swung first. When the fighting stopped, Sanders told defendant "to calm down and don't react anymore, don't make it worse."

¶ 10         Sanders thought "the fighting was over," but defendant approached him again, saying he was going to "beat" and "kill" him. As defendant was "walking around [him]," Sanders kept telling him "to calm down, Please, let's don't do this *** You don't want no more of this." Defendant "kept coming towards [him]." After the defendant "threw [his] backpack onto the train tracks," they began fighting again. At some point, defendant stabbed Sanders with a knife, but he did not immediately realize he had been injured.

¶ 11         Defendant dropped the knife during the fight. Sanders picked it up and threw it on top of a salt container "so [defendant] couldn't get it." Sanders restrained defendant on the ground until the police arrived. While he was being restrained, defendant kept telling Sanders that he was going to "kill" him.

¶ 12         After the police arrived, Sanders was taken to Stroger Hospital. He eventually underwent two surgeries for his injuries. Sanders acknowledged prior felony convictions for domestic battery and possession of a controlled substance but denied threatening anyone during his domestic battery arrest.

¶ 13         Tyree Barnes was a customer service assistant for the CTA on February 3, 2019. Around

11:00 p.m., Barnes approached defendant to advise him that the trains were delayed. Defendant "became immediately irate" and asked whether Barnes "picked him out *** because of the color of his skin?" Barnes responded, "I'm also black", but defendant kept "cussing [him] out." Sanders calmly intervened, telling defendant, "[I]t's not worth it, it's just a CTA employee, he's just doing his job, just letting us know what's going on with the trains." When his supervisor Jose Rodriguez arrived, Barnes left the platform to contact the police. When he returned, defendant and Sanders were "laid out on the platform" and Sanders had "multiple cuts."

¶ 14    Jose Rodriguez testified that defendant and Sanders were arguing on the platform, and defendant was "being irate" towards Sanders, who "just kept *** telling [him] to relax, *** that it wasn't worth it." The two got in each other's face and began to "scuffle." Sanders "threw the [defendant] away from him and he told him *** just stop, you don't want none of this, just let it go."

¶ 15    Defendant walked away, but then he came back, grabbed Sanders's bag, and threw it onto the train tracks. Rodriguez radioed to stop the train so he could retrieve the bag from the train tracks. While he was down on the tracks, Rodriguez "saw that they were going to start fighting again. And [defendant] pulled out a switchblade *** and I told [Sanders] *** be careful, he has a knife." Rodriguez never saw Sanders "with any weapons in his hands."

¶ 16    Chicago Police Officers Taylor Golden and Daniel Mieszcak arrived at the platform at approximately 11:30 p.m. Golden saw two men on the ground, with one man on top of the other. He later learned that the man on top was defendant and the man on the bottom was Sanders. Sanders had a "major laceration to his left arm" and a "laceration to his face." Golden observed blood on the platform and recovered an "open" knife on top of a nearby white box.

¶ 17    The CTA surveillance videos admitted into evidence show that Sanders approached

defendant and Barnes while they were talking on the platform. Although the quality of the video is a bit grainy, defendant and Sanders appear to be scuffling with each other. After about a minute, Sanders walked away down the platform, but defendant followed him. When defendant reached him, Sanders pushed him backwards and defendant walked away again. About ten seconds later, defendant came back and threw Sanders's backpack onto the train tracks. Sanders walked towards defendant as he backed away with his hands up. When they began fighting again, defendant was holding something in his hand. Sanders knocked defendant to the ground and hovered over him while he was crouched on his hands and knees. Sanders grabbed something off the ground, placed it on top of a nearby white bin, and restrained defendant on the ground until the police arrived.

¶ 18    The parties stipulated that Sanders suffered multiple stab wounds to his left arm and underwent two separate surgeries for his injuries. The parties also stipulated that defendant suffered a fracture to his left nasal bone.

¶ 19    Chicago Police Officer Kevin Graves was called to testify on behalf of the defendant. Graves does not recall Sanders saying that defendant "was making threats against [him] while [Sanders] had [defendant] on the ground" when he talked to him at Stroger Hospital. Graves also talked to Rodriguez a few days later at the police station. During a videotaped interview, Rodriguez stated, "[B]y the time I went *** down to track level and was retrieving the gentleman's bag and threw it back on the platform is when I noticed the young guy had something in his hand, and I told him 'be careful he's got something.' "

¶ 20    At the jury instruction conference, the State tendered Illinois Pattern Jury Instruction, Criminal, No. 24-25.09 (4th ed. 2000) (hereinafter IPI Criminal 4th), arguing that defendant was the "initial aggressor" in the confrontation and was not justified in using force against Sanders.

Over defendant's objection, the trial court agreed to give the instruction, finding that "[T]here is evidence presented, so this is a good question of fact for the trier of fact."

¶ 21 The State also requested that the jury be given IPI Criminal 4th No. 24-25.09X, which states, "A person who has not initially provoked the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." This instruction was also given over defendant's objection.

¶ 22 The jury found defendant guilty of aggravated battery and not guilty of attempt first degree murder. Defendant was sentenced to a term of 29 months' imprisonment.

¶ 23                                      ANALYSIS

¶ 24                            Sufficiency of the Evidence

¶ 25 Defendant argues that the State did not disprove that he acted in self-defense. When a defendant raises the affirmative defense of self-defense, the State has the burden of disproving the defense beyond a reasonable doubt, in addition to proving the elements of the charged offense. *People v. Gray*, 2017 IL 120958, ¶ 50; *People v. Lee*, 213 Ill. 2d 218, 224 (2004). In reviewing the sufficiency of the evidence where self-defense is raised, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).

¶ 26 It is the responsibility of the jury to resolve any conflicts in the evidence. *Gray*, 2017 IL 120958, ¶ 51. This court will not retry the defendant or substitute its judgment for that of the trier of fact on the weight of the evidence or credibility of witnesses. *People v. Brown*, 2013 IL 114196, ¶ 48. We will also not reverse a conviction if any rational trier of fact could have found beyond a

reasonable doubt that defendant did not act in self-defense. *Gray*, 2017 IL 120958, ¶ 50; see *Jackson*, 443 U.S. 307.

¶ 27    While not conclusive, we defer to the jury's findings on the credibility of witnesses and the reasonable inferences to be drawn from the evidence. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). "Whether defendant acted in self-defense or as the 'initial aggressor' in the conflict is a factual question, with all the deference to the jury it entails." *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 44.

¶ 28    Self-defense includes the following elements: (1) unlawful force threatened against the defendant; (2) the defendant was not the aggressor; (3) the danger of the harm was imminent; (4) the use of force was necessary; (5) the defendant actually and subjectively believed there was a danger that required him to use the force applied; and (6) the defendant's belief was objectively reasonable. 720 ILCS 5/7-1 (West 2018); *Gray*, 2017 IL 120958, ¶ 50.

¶ 29    The parties agree that three separate physical confrontations occurred between the defendant and Sanders. Defendant focuses on the third confrontation, arguing that the State failed to disprove that his "responsive force" (*i.e.* using a knife) was justified because he "reasonably believed he was in imminent danger of great bodily harm" and "he had exhausted any reasonable means of escape."

¶ 30    The State argues that defendant provoked the force used against him through all of his actions culminating in the third confrontation, and that his belief that deadly force was required was unreasonable. Viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that the defendant was not justified in using the force that he did.

¶ 31 The video does not clearly depict the first contact between the defendant and Sanders, Rodriguez was "not sure" who initiated the first physical contact, and Sanders admitted he did not recall who swung first. Nevertheless, a person may be the initial aggressor in a conflict if, as the jury was instructed here, he "initially provoke[d] the use of force against himself." IPI Criminal 4th No. 24-25.09.

¶ 32 The evidence shows that defendant was screaming and cursing on the CTA platform. When Sanders attempted to diffuse the situation, defendant assumed a "fighting posture" and threatened to "beat" and "kill" him. Though he walked away momentarily, defendant returned holding a knife, grabbed Sanders's bag and threw it onto the train tracks. The State argues that defendant's actions provoked Sanders to protect himself from defendant's imminent attack, making defendant the initial aggressor.

¶ 33 Defendant responds that, even if he was the initial aggressor, the State "failed to show that [he] was unreasonable or unjustified in using his knife when he did." He "did not try to use a knife in his defense until he realized he had ticked off the wrong person with no other way to avoid imminent and serious injury at the hands of a large and angry man." Viewed in the light most favorable to the State, defendant's belief was not objectively reasonable.

¶ 34 The defendant intentionally provoked a third confrontation with Sanders by approaching him with a knife in his hand and throwing his belongings onto the train tracks. Combined with defendant's earlier threats to "beat" and "kill" him, Sanders reasonably feared that he was about to be attacked by the armed defendant.

¶ 35 While the security footage does not depict the exact moment when defendant displayed the knife, he was clearly holding it during the third confrontation. It is well settled that reviewing courts will not second-guess a jury's decision without good reason. The jury obviously rejected

defendant's argument that he "used [the] knife to disable Keith Sanders'[s] arm before Keith Sanders could start raining blows down upon him." Based on the evidence, we cannot say that the jury's conclusion that defendant did not act in self-defense was unreasonable.

¶ 36                                Jury Instruction

¶ 37        The purpose of jury instructions is "to guide the jury in its deliberations and to assist the jury in reaching a proper verdict through application of legal principles to the evidence and the law." *People v. Parker*, 223 Ill. 2d 494. 501 (2006). "Jury instructions should not be misleading or confusing," (*People v. Pinkney*, 322 Ill. App. 3d 707, 717 (2012)), and "Illinois pattern jury instructions have been painstakingly drafted so as to clearly and concisely state the law." *People v. Durr*, 215 Ill. 2d 283, 301 (2005).

¶ 38        In this case, the jury received IPI Criminal 4th No. 25.09, describing an "Initial Aggressor's Use of Force." This instruction provides, in relevant part:

> A person who initially provokes the use of force against himself is justified in the use of force only if: (1) the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." IPI Criminal 4th No. 24-25.09.

¶ 39        The jury also received IPI Criminal 4th No. 25.09X, describing the lack of a duty to retreat by one who is not the initial aggressor. The committee note to IPI Criminal 4th No. 24-25.09X provides that both instructions should be given in appropriate cases. Ultimately, "[t]he decision as to whether both instructions are appropriate, given the specific alleged facts of a case, is left to the trial court's discretion." *People v. Alexander*, 408 Ill. App. 3d 994, 1002 (2011).

¶ 40 The testimony of Sanders, Rodriguez, and Barnes established that defendant was being belligerent and aggressive on the CTA platform. When Sanders tried to deescalate the situation, defendant assumed a "fighting posture," threatened to "beat" and "kill" him, and threw his bag onto the train tracks while brandishing a knife. Based on this evidence, the trial court did not abuse its discretion by giving the jury both instructions.

¶ 41                                Impeachment of Keith Sanders

¶ 42 Defendant asserts that the trial court erred in allowing only two of Sanders's three felony convictions to be used for purposes of impeachment. Defendant claims that the court did not properly weigh the probative value of these convictions against their prejudicial effect as required by *People v. Montgomery*, 47 Ill. 2d 510 (1971).

¶ 43 Under *Montgomery*, evidence of a witness's prior conviction is admissible to attack his credibility only if: (1) the conviction involved a crime punishable by death or imprisonment of over one year, or involved dishonesty or false statement regardless of punishment; (2) not more than 10 years have passed since the date of conviction or the release of the witness from confinement, whichever is later; and (3) the probative value of admitting the conviction outweighs the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516-19. Whether a witness's prior conviction is admissible for impeachment purposes is within the trial court's discretion. *People v. Atkinson*, 186 Ill. 2d 450, 455-56 (1999).

¶ 44 Here, the trial court found that Sanders's two most recent felony convictions were "relevant and *** not overly prejudicial and they're more probative than prejudicial." The court also determined that the prejudicial effect of allowing evidence of Sanders's escape conviction outweighed its probative value.

¶ 45        We find that the trial court did not abuse its discretion in admitting only the most recent convictions for purposes of impeachment. This evidence "was sufficient to challenge [Sanders's] credibility without overemphasizing his criminal history." *People v. Calderon*, 369 Ill. App. 3d 221, 229 (2006) (in a prosecution for attempt first-degree murder, finding that the trial court did not abuse its discretion in admitting only one of the victim's three prior felony convictions for impeachment purposes); see also *People v. Sparks*, 314 Ill. App. 3d 268, 270-71 (2000) (trial court did not abuse its discretion in refusing to allow evidence of two of the defendant's prior convictions because one conviction was enough to impeach the defendant's credibility).

¶ 46                                Use of the Term "Victim"

¶ 47        Finally, defendant asserts that he was deprived of a fair trial where the prosecutor and a witness referred to Sanders as the "victim." Defendant admits that he failed to preserve this claim by raising it in a posttrial motion but seeks review under the principles of plain error.

¶ 48        The plain error doctrine permits a reviewing court to consider an unpreserved error when a clear or obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatowski*, 225 Ill. 2d 551, 565 (2007). Under either prong, the burden of persuasion rests with the defendant. *People v. Sargent*, 239 Ill. 2d 166, 190 (2010). Before considering whether plain error applies, we must first determine whether any error occurred. *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009).

¶ 49        "Victim" is often used as an explanatory term for the person harmed as the result of an alleged crime. For example, the aggravated battery statute includes a subsection entitled "Offense

based on the status of victim." 720 ILCS 5/12-3.05(d) (West 2018). While defendant was not charged under this subsection, it is illustrative of the legislature's common usage of the term to distinguish the person allegedly *harmed* from the person *doing the harm*. Numerous other criminal statutes include the term when referring to the person allegedly harmed by the conduct of the defendant. See, *e.g.*, 720 ILCS 5/10-9(a)(10) (West 2018) (Trafficking in persons, involuntary servitude, and related offenses); 720 ILCS 5/11-0.1 (West 2018) (Sex offenses); 720 ILCS 5/18-1(b) (West 2018) (Aggravated robbery).

¶ 50    In *People v. Jones*, 2016 IL App (1st) 141008, a case relied on by defendant, this court found that repeatedly referring to the defendant as a "cold blooded criminal" in opening statement "conjured a powerful image calculated to invoke an emotional response" and "had no basis in fact, given that prior to [the] case, Jones had never been convicted of a crime." *Jones*, 2016 IL App (1st) 141008, ¶ 24. In contrast, the prosecutor's use of the word "victim" in this case was justified in view of undisputed evidence that defendant stabbed Sanders during the course of multiple physical altercations on the train platform.

¶ 51    Based on this record, we find that no error occurred. Accordingly, the plain error doctrine does not apply, and defendant has forfeited review of this claim. See *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010).

¶ 52                                CONCLUSION

¶ 53    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.