2023 IL App (1st) 220428-U

SECOND DIVISION
March 31, 2023

No. 1-22-0428

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20 CR 372 |
| | ) | |
| MATEUSZ ZABRZENSKI, | ) | |
| | ) | Honorable Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justice Cobbs concurred in the judgment.
Justice Ellis specially concurred.

ORDER

¶ 1    *Held*: We affirm defendant's conviction and sentence for first-degree murder; although defendant claimed self-defense, the trial court did not err when it allowed the state to refer to the deceased as a victim; the trial court erred when it gave the "initial aggressor instruction" to the jury, however the error was harmless because the evidence of defendant's guilt is overwhelming; defendant's 33-year sentence for first-degree murder is not excessive.

¶ 2    Defendant Mateusz Zabrzenski appeals his conviction and 33-year prison sentence following a jury trial in which he was convicted of first-degree murder. On appeal, defendant argues that he was denied a fair trial where the State and its witnesses referred to the person

killed as the "victim," despite defendant's assertion that he acted in self-defense. Defendant also argues that he was denied a fair trial based on the trial court's decision to provide the "initial aggressor" jury instruction for the jury's consideration. Last, defendant argues that his 33-year sentence is excessive because he is a first-time offender with rehabilitative potential. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4     Defendant Mateusz Zabrzenski was convicted of the June 24, 2013 murder of Sarah Krasilova in her apartment in Chicago. She suffered multiple stab wounds and was strangled. After Krasilova was killed, defendant fled to Poland where, six years later, he was arrested and extradited to the United States. Defendant was charged with first-degree murder and was tried by a jury. Defendant asserted at trial that he acted in self-defense. The jury rejected defendant's assertion of self-defense and found him guilty of first-degree murder.

¶ 5     Before the trial, defendant filed motions *in limine*. Defendant asked the court to prohibit the State from referring to Krasilova as a "victim" during the trial. Defense counsel argued that, since defendant was claiming self-defense, it was up to the jury to decide if Krasilova was a victim. Counsel further argued that the term "victim" is prejudicial and requested that the State be ordered to refer to Krasilova as "the decedent" which defense counsel maintained was "the most accurate description of her" prior to the jury weighing in on the case. The State contested the motion and argued that it was entitled to refer to Krasilova as the victim during the trial. The trial court denied defendant's motion *in limine*.

¶ 6     At trial, Justyna Zygmunt testified that she came to the United States from Poland in 2006. After meeting defendant through work, Justyna and defendant became very close friends,

speaking to each other every day. Justyna met Sarah Krasilova as a mutual friend of defendant. Justyna testified that defendant moved in with Krasilova in early June 2013.

¶ 7 On the day Krasilova was killed, Justyna received three phone calls from defendant at around 2:00 a.m. Justyna did not answer the first two calls, but she answered the third. Defendant was crying and told Justyna that he needed her help. Defendant told Justyna that he had been sleeping in the apartment he was sharing with Krasilova. Krasilova came home acting aggressively. Defendant told Justyna that Krasilova impaled herself with a knife. Justyna told defendant to call the police, but he responded that he did not want to get into trouble.

¶ 8 The next day, defendant visited Justyna at her office. They went outside to smoke a cigarette, and Justyna again asked defendant what happened. Defendant told her that Krasilova came home acting aggressively and calling him "Damian," the name of her ex-boyfriend. Krasilova was having trouble getting into the apartment. Once she made it inside the apartment, she got a knife and attacked defendant. Defendant told Justyna that, while he was trying to defend himself, he pushed Krasilova and the knife impaled her. Justyna again told defendant that he should call the police, but he said he did not want to go to jail. Justyna noted that defendant did not have any noticeable injuries to indicate he had been in a fight.

¶ 9 Defendant told Justyna that he had purchased a plane ticket to go to Poland and he asked her to go to the Polish embassy with him. Justyna declined defendant's invitation to go to the embassy, and he told her he would see her the next time she visited Poland. Defendant then left.

¶ 10 Later that night, Justyna went on Facebook and saw that defendant posted a picture of himself embracing his mother at the airport. The Facebook post was captioned "a star is returning." Justyna concluded that something nefarious must have happened because defendant

loved living in the United States. Justyna told her mother about what had transpired throughout that day and they decided to notify the police.

¶ 11    While she was speaking to detectives and telling them what had occurred, Justyna went to her Facebook account to show them the posts defendant had published. When she pulled up her account, she saw that defendant had posted another photo of himself from the plane. Defendant posted that he was traveling "business class, lol" along with another post in which he said "Chicago, I am going to miss you."

¶ 12    About a week later, defendant contacted Justyna from Poland and informed her that he was angry that she did not help him when he needed her. Justyna testified that she told defendant she knew Krasilova did not impale herself with the knife and that she was the one who was upset because defendant tried to drag her into the killing and ask her for help. That conversation was the last time Justyna spoke to defendant.

¶ 13    Angelika Mlekicka testified that she met Krasilova while working at a restaurant and they became close friends. Angelika, Krasilova, and defendant all hung out together frequently and they all became pretty close. Angelika lived in the same apartment building as Krasilova. Angelika testified that Krasilova and her boyfriend, Damian, broke up in June 2013 and that defendant moved in with Krasilova. Angelika testified that Krasilova always left the door to her apartment unlocked. The main entrance to the apartment building required a key, but the door to Krasilova's unit was always unlocked. Angelika knew the door was always unlocked because she lived in the same building and went to Krasilova's unit almost daily.

¶ 14    In the early morning hours of June 24, 2013, Angelika received a phone call from defendant while she was working the nightshift at a nightclub. Angelika did not answer the phone, and after work, she went home and went to bed without returning defendant's call. When

Angelika woke up the next morning, she had several more missed calls from defendant and she received a text message from him that said, "I'm begging you to call me back."

¶ 15    Around 2:00 pm on June 24th, Angelika received another call from defendant, which she answered. Defendant told Angelika that he was at the embassy and was going back to Poland. Defendant's statement caught Angelika's attention because she knew defendant was in the country on an expired visa and that, if he left the United States, he would not be able to return. Defendant then told Angelika that Krasilova was dead. Defendant explained that Krasilova came at him with a knife and that he pushed her and she fell on the knife. Defendant told Angelika that he took the knife and went to his mother's house. After the call ended, Angelika tried to contact Krasilova but received no response.

¶ 16    Later that day, defendant called Angelika again and asked her to come over to his mother's house. When she arrived, she asked defendant why he had not involved the police in the situation, and she urged him to call them. Defendant said no. Defendant responded by joking that they should just leave Krasilova there with her cats and that her cats would eat her. Defendant also joked that they should just go back, chop up her body, and scatter her all over Illinois. Angelika heard defendant ask his mother if she had hidden the knife to which defendant's mom responded affirmatively that she had hidden the knife and put it in a place the police would not find it. Angelika was at defendant's mother's house when defendant's ride to the airport arrived. Defendant said goodbye to Angelika, and defendant and his mother got into the car and left.

¶ 17    After Angelika left defendant's mother's house, she called her friend, Erwin Monroe, a Chicago Police Officer. Monroe got Chicago Police Department detectives involved and the detectives met Angelika at Krasilova's apartment. Angelika waited outside while the detectives

went into the apartment. The detectives informed Angelika that Krasilova was dead, and her body was in the apartment. Angelika went to the police station and gave a more detailed interview a few days later. She learned during that interview that Krasilova had been beaten, strangled, and stabbed multiple times. Angelika then told the police about the conversation she heard between defendant and his mother about hiding the knife that killed Krasilova. Angelika did not tell the police about the conversation concerning the knife earlier because she did not want to get defendant's mother in trouble, but she decided to do so after learning defendant had lied to her about what happened.

¶ 18    Forensic investigator Paul Presnell testified that he went to Krasilova's apartment on the day she died and discovered her body on her bedroom floor. Presnell observed that she had been stabbed multiple times, with stab wounds to her neck area, upper chest, lower chest, and abdomen. Presnell observed blood in several areas and took some swabs for laboratory analysis. He also put bags over Krasilova's hands to preserve any evidence that might be on her hands or under her fingernails. Presnell observed that there was a cord underneath Krasilova's body that looked like an internet cable and there was a phone charger cord lying near her body. He photographed and took video of the scene.

¶ 19    Detective John Campbell testified that he came to Krasilova's apartment the day she was killed. He met Angelika there and spoke to her briefly before going inside. When entering the apartment, Detective Campbell noticed damage to the front door, appearing as if it might have been kicked in. Detective Campbell went to Krasilova's bedroom and saw her body. There were multiple stab wounds to the chest and stomach area, and it appeared Krasilova had been dead for a while because the blood around her body was dry. He observed some cords near Krasilova's body. He also found Krasilova's cell phone.

¶ 20     Detective Campbell spoke with Krasilova's neighbor, Kinga Rogovska. Rogovska told Detective Campbell that she heard a loud disturbance coming from the area of Krasilova's apartment around 1:00 or 1:30 in the morning. Rogovska heard Krasilova yelling and banging on the door to the apartment. Rogovska heard Krasilova kick in the door to the apartment. Once Krasilova was inside, Rogovska heard Krasilova and her roommate yelling at each other. Detective Campbell learned that Justyna Zygmunt was speaking to other detectives, and he also learned that defendant had taken a flight to Warsaw, Poland—on a one-way ticket.

¶ 21     A week later, detectives interviewed defendant's mother, Margarota Zabrzenski. Detectives spoke to Margarota again a couple days later and received consent to search her home. When detectives arrived to search her home, Margarota told them that they would find a knife hidden in a red bag in a basement closet. Detectives went to that location and found the knife in a red bag, as described by Margarota. The knife was sent to the lab for analysis.

¶ 22     Assistant Cook County Medical Examiner, Dr. Marta Helenowski, conducted the postmortem examination of Krasilova's body. Dr. Helenowski observed three classifications of injuries to Krasilova's body: sharp force injuries, blunt force injuries, and strangulation. Dr. Helenowski recorded nine specific sharp force injuries. First, an incise wound to the back of Krasilova's head, resulting in a massive subgaleal hemorrhage. Second, a stab wound to the right side of the neck. Third, fourth, and fifth, stab wounds to the chest, one of which was particularly deep and penetrated the ribcage, lung, and pulmonary artery. Sixth, a stab wound to the abdomen, which was approximately three inches deep and penetrated the abdomen and small bowel. Seventh, a stab wound into the stomach tissue about an inch deep. Eighth, a stab wound right above the umbilicus which was very deep, penetrating the internal organs of the abdomen

all the way to an area next to the backbone. Ninth, Dr. Helenowski recorded a few superficial stab wounds around the umbilicus.

¶ 23    Dr. Helenowski also recorded a slash wound to Krasilova's wrist that was consistent with a defensive wound from someone trying to fight off a stabbing. Dr. Helenowski examined the knife that was recovered from defendant's mother's house and indicated it was consistent with the type of knife that would cause the stab wounds suffered by Krasilova.

¶ 24    As for blunt force injuries, Dr. Helenowski observed massive bruising around Krasilova's left eye. Krasilova's eye itself appeared swollen and purple with hemorrhaging throughout the face and both eyelids. Krasilova also had bruising on her chin and bite marks on her tongue.

¶ 25    As for strangulation injuries, Dr. Helenowski observed two thin ligature impression marks on the right side of Krasilova's neck. On the left side of Krasilova's neck, there was a ligature impression with an abrasion encompassing the area of the larynx. There was hemorrhaging in Krasilova's face and neck, and there was congestion in her face that resulted in her face appearing purple. The cords found around Krasilova's body were consistent with the marks on her neck, according to Dr. Helenowski. Dr. Helenowski testified that the most likely cause of death was strangulation, rather than the stab wounds because blood would have needed to be flowing at the time of strangulation for the bruising on Krasilova's neck to appear as it did.

¶ 26    At the time Dr. Helenowski conducted the postmortem examination in this case, she was a "fellow" and her work had to be supervised and then signed off on by a more senior medical examiner. However, by the time she testified in this case, Dr. Helenowski was fully certified and had acquired more experience. In her original report, Dr. Helenowski concluded that the cause of death was homicide by stabbing. However, in her testimony in this case, she asserted that the

cause of death was more likely homicide by asphyxiation, with the multiple sharp-force stab wounds being a contributing cause of death.

¶ 27    A toxicology report done on Krasilova found that her blood-alcohol level at the time she died was .28. Defendant's DNA was recovered from underneath Krasilova's fingernail. The knife that was recovered from defendant's mother's house had no fingerprints on it and there was no blood on the knife that could be detected or analyzed.

¶ 28    After the State rested its case, defendant called witnesses to testify about Krasilova's aggressive tendencies. Shelly Hall testified that she was at a nightclub in 2011. She was 50 years old at the time and she went to the club after being invited by the club's manager who was a friend of hers. At some point while she was dancing, Hall felt someone pull her hair from behind. When she turned around, she saw Krasilova. Hall had not met Krasilova before, but she recognized her because Krasilova had been harassing her on Facebook for months. Hall was dating Krasilova's ex-boyfriend. After pulling Hall's hair, Krasilova called her a "rich old whore" and a "bitch" before throwing a drink in Hall's face.

¶ 29    Hall located her friend who was the manager of the club and told him what happened. Krasilova saw Hall, charged at her, and punched her in the face. Krasilova ran towards the back of the club as the club manager called for security. A security guard picked up Krasilova and, as he was trying to carry her out, she punched the security guard, escaped his grasp, and charged at Hall again. The security guard captured Krasilova again and escorted her out of the club. Hall suffered a black eye. Krasilova was charged for her actions at the nightclub and pled guilty.

¶ 30    Dorota Betlejewska also testified about Krasilova's aggressive tendencies. She testified that she met Krasilova through a mutual friend in 2013. In April 2013, Krasilova invited Betlejewska over to her apartment. Krasilova's boyfriend was also there. The three of them

drank and listened to music. It was the first time Betlejewska had really spent significant time hanging out with Krasilova. At some point, Krasilova could not find her cellphone and she accused Betlejewska of taking her phone. Betlejewska told Krasilova that she did not take the phone, but Krasilova started coming toward her in a threatening manner. As Krasilova was approaching her, Betlejewska happened to see the phone sitting on the television stand. Betlejewska tried to tell Krasilova that the phone was there, but Krasilova would not listen and kept approaching her. Krasilova began hitting and kicking Betlejewska. Betlejewska decided to leave and started to do so, but Krasilova kept pursuing her. Krasilova pushed her and punched her in the side of her face. Betlejewska fell down the stairs when she was exiting Krasilova's apartment, hitting her head on the neighbor's door once she reached the bottom of the stairs. She believes that Krasilova pushed her down the stairs. Krasilova's neighbor called an ambulance and Betlejewska was taken to the hospital. Betlejewska testified that Krasilova was acting different and acting very scary as that incident unfolded.

¶ 31     Defendant then testified on his own behalf. He was 33 years old at the time of trial in December 2021. Defendant's mother moved to Chicago while he was in high school, and he followed her to Chicago a few years later. Defendant came to the United States on a tourist visa, and he stayed longer than the terms of the visa allowed. He remained in the United States after that point because, if he left, he would not be allowed back into the country for at least 10 years. Defendant lived with his mother for almost the entire time he was in the country.

¶ 32     Defendant met Krasilova when they both worked at the same restaurant. They quickly became close friends. Defendant is gay, and his relationship with Krasilova was always platonic. Defendant also met Angelika Mlekicka while working at the restaurant, and Angelika and

Krasilova lived in apartments that were in the same building as the restaurant in which they all worked. Defendant testified that he, Angelika, and Krasilova were all really close, "like family."

¶ 33 In June 2013, Krasilova and her boyfriend Damian broke up. Krasilova was devastated, according to defendant. Krasilova asked defendant to come stay with her for a little while until she was feeling better. Defendant brought a few things like clothes and toiletries over to Krasilova's apartment, but he kept everything else at his mother's house. Defendant was staying in Krasilova's second bedroom.

¶ 34 Defendant testified that Krasilova did not give him keys to the apartment. He testified, contrary to Angelika's testimony, that Krasilova always kept the front door to her apartment locked but that she kept the back door unlocked. On the day before Krasilova's death, she told defendant she was going to the beach with some friends. Krasilova told defendant she would stay in touch so that he could pick up the apartment keys from her on his way home. He texted Krasilova on his way home but did not get the keys from her. When he arrived, he waited for someone to leave the apartment building so he could get in through the main door. After getting past the main door, he went to Krasilova's apartment and entered through the unlocked rear door. He texted Krasilova again about the keys when he was in the apartment but did not hear back from her. After a while, he fell asleep.

¶ 35 Defendant was awakened by a loud boom. Defendant testified that Krasilova ran into the bedroom where he was sleeping "in a rage." She jumped on top of him while screaming and yelling and began hitting him in the head and chest. Krasilova was calling him "Damian." Defendant tried to deflect Krasilova's blows and push her off of him, and he may have hit her with his elbow in the process. Eventually, Krasilova got off of him and went to the kitchen. He followed her into the kitchen, asking her "what is going on?" Defendant testified that Krasilova

then grabbed a large knife from the kitchen and began swinging it wildly at him. Defendant testified that Krasilova reeked of alcohol and he could tell she was drunk. He had seen her drunk many times, but her actions and her appearance that night were like nothing he had ever seen from her before.

¶ 36     Defendant testified that he backed away from Krasilova as she was swinging the knife at him. As she backed him down the hallway leading to the back door of the apartment, he grabbed her around the neck and pushed her backwards into her bedroom while pleading with her to stop. Defendant testified that, for a second, Krasilova looked at him with recognition. He pushed her onto the bedroom floor and she dropped the knife. He decided to go get some clothes from the second bedroom where he was staying and then leave. As he turned around to walk away, Krasilova grabbed the knife and charged at him again. He grabbed Krasilova's hand and the two of them struggled over the knife, pushing and pulling it, seeking some control. Defendant testified that, during that struggle for the knife, Krasilova was stabbed.

¶ 37     Defendant went to the second bedroom, got some clothes, and started to leave. Before he left, he looked back in Krasilova's bedroom and saw that she was lying on her back. She was bloody and she was silent and motionless. Defendant grabbed the knife, called his mother, and left Krasilova's apartment.

¶ 38     Defendant testified that he was feeling afraid during the confrontation with Krasilova. He had never experienced anything like that, and he believed that Krasilova was going to hurt him or kill him. Defendant testified that he was only attempting to take the knife from Krasilova because he wanted her to stop coming after him and that the whole incident lasted less than a minute. Defendant denied that he ever strangled Krasilova with a cord and stated that he only choked her for a few seconds while she was on top of him in an effort to get free from her.

¶ 39    Defendant testified that he did not call the police because he was in the country illegally and because he had heard stories from other immigrants about mistreatment by the police. He believed that his only option was to flee the country. His mother booked a flight for him to Poland. He went to Walgreens and got passport photos, and then he went to the Polish embassy to get a temporary passport. He lied on his passport application and stated that his grandfather in Poland was dying and he needed to travel there. He borrowed money from a friend to pay for the plane ticket but did not tell that friend what had happened. He denied that he joked with Angelika that they should just let Krasilova's cats eat her body. He testified that Angelika said that there must be something he could do to avoid going to jail, and he said "cutting up the body is not an option," a statement he regretted making. Defendant testified that he was drinking the whole day and did not really remember making the Facebook posts about his travels to Poland. He slept the entire flight. He spoke to the Chicago Police four times while he was in Poland after learning from his mother that the police had visited her and wanted to speak to him.

¶ 40    During the jury instruction conference, defendant objected to the court giving the jury the "initial aggressor" jury instruction. Defendant argued that there was no evidence offered that he was the initial aggressor and, therefore, the instruction was not warranted. The State argued that the physical evidence contradicted defendant's testimony about the confrontation and argued that the question about who was the initial aggressor was open to argument from both sides. The trial court decided that the instruction should be given, and it overruled defendant's objection.

¶ 41    Following deliberations, the jury found defendant guilty of first-degree murder. Following a sentencing hearing, the trial court sentenced defendant to 33 years in prison. Defendant now appeals both his conviction and his sentence.

¶ 42                                          ANALYSIS

¶ 43    Defendant appeals his conviction and sentence. He raises three issues on appeal. First, defendant argues he was denied a fair trial because the trial court allowed the State to refer to Krasilova as the "victim." Second, defendant argues that he was denied a fair trial because the trial court instructed the jury with the "initial aggressor" pattern jury instruction where there was no evidence that defendant initially provoked the confrontation with Krasilova. Third, defendant argues that his 33-year sentence is excessive because he is a first-time offender with rehabilitative potential.

¶ 44                          A. Use of the Term "Victim" During Trial

¶ 45    Defendant contends that he was denied a fair trial because the State and its witnesses used the term "victim" to refer to Krasilova. Prior to trial, defendant filed a motion *in limine* urging the court to bar the State from referring to Krasilova as a victim. Defendant argued in the trial court and argues again here that it was up to the jury to decide whether Krasilova was really a "victim" because he affirmatively asserted that he acted in self-defense. Defendant contends that "pre-adjudication use of the term 'victim' exerts improper emotional influence; it diminishes the presumption of innocence and the State's burden of proof, and it invades the province of the jury by providing a legal conclusion to a central dispute in the case—whether a crime was actually committed." Citing Anna Roberts, *Victims, Right?*, 42 CARDOZO L. REV. 1449, 1451 (2021).

¶ 46    Defendant discusses a few cases decided in Illinois where courts have mentioned the potential pitfalls of referring to the deceased as a victim during trial—particularly where the defendant is claiming to have acted in self-defense (citing *e.g.*, *People v. Cruz*, 2021 IL App (1st) 190132, ¶ 92; *People v. Anderson*, 234 Ill. App. 3d 899, 909 (1992)). Recently, in *Cruz* the

defendant argued the trial court erred when it responded to a question sent out by the jury in which the jury referred to the decedent in its note as "the victim." *Cruz*, 2021 IL App (1st) 190132, ¶ 70. In that case, the jury sent a question to the court during deliberations asking "[c]an we see evidence the defendant lunged at victim during fight[?]" *Id*. at ¶ 70. By simply playing the video requested by the jury, the defendant in *Cruz* argued that the trial court endorsed the notion that the person harmed was "the victim" despite defendant claiming he acted in self-defense. *Id*. at ¶ 71. The defendant in that case argued that the court should have admonished the jury that the person who was stabbed was not a "victim" at that juncture of the case, and the defendant argued that the trial court's failure to do so amounted to an implicit endorsement of the view that the person who was harmed was legally a victim. *Id*. at ¶ 79. We rejected the defendant's argument and explained that the use of the word "victim" could have just referred to the person who was injured—the person who was stabbed during the fight—without amounting to an insinuation that the defendant was guilty. *Id*. at ¶¶ 87-88.

¶ 47    Defendant acknowledges that no court in Illinois has ever found that a defendant asserting that he acted in self-defense was denied the right to a fair trial simply because the State referred to the person killed as a "victim." To the contrary, every time the issue has been specifically raised, we have rejected the argument outright or held that the terminology used was not so prejudicial as to deny the defendant a fair trial.

¶ 48    In an unpublished order issued last year, the same issue was presented with a similar factual predicate. See *People v. Hurley*, 2022 IL App (1st) 200650-U, (petition for leave to appeal denied, 201 N.E.3d 579 (Ill. 2023)). In *Hurley*, the court acknowledged various Illinois statutes use the term "victim" to refer to the person the defendant stands accused of harming. See *e.g.*, 725 ILCS 120/3(a)(1) (West 2020). Prior to *Hurley*, we addressed a defendant's argument

that he was unfairly prejudiced by the prosecutor referring to the complaining witness as a victim, and we rejected the defendant's argument. See *People v. Zernel*, 259 Ill. App. 3d 949, 957 (1994). In *Zernel*, we recognized that the State's use of the term "victim" was a permissible reference to the person *alleging* to have been harmed and was not a prejudicial error. *Id.*; see also *People v. Anderson*, 234 Ill. App. 3d 899, 909 (1992) (affirming defendant's conviction over his claim that the State improperly used the term "victim" to play on the sympathies and prejudices of the jury); *People v. DeSavieu*, 120 Ill. App. 3d 420, 432 (1983) (finding that the State's reference to the deceased as "the victim," even coupled with references to the deceased's surviving family and his standing in the community, were not so inflammatory as to have affected the jury's ability to rationally evaluate the evidence); *People v. Wasmund*, 2022 IL App (5th) 190525, ¶ 99 (using the term "victim" intermittently during a trial to refer to the person killed was not error).

¶ 49     During the trial in this case, the State primarily referred to Krasilova as "Sarah." The State did not use the word "victim" at all to refer to Krasilova during its opening statement or closing argument. When the term "victim" was used during trial, it was often used by witnesses, not the prosecutor. When the State or the State's witnesses did refer to Krasilova as the "victim" the references were brief and inconspicuous. The references were made unemotionally for identification and shorthand purposes to refer to the person harmed rather than being a designed campaign to unfairly persuade the jury that defendant acted without legal justification.

¶ 50     The State's theory of the case at trial was that Krasilova was, in fact, a victim. The State was entitled to advance that theory to the jury during the adversarial process. The State submitted the evidence to the jury that it believed supported its theory that Krasilova was a "victim." In support of its position that Krasilova was the victim of a crime rather than someone who could

16

be justifiably killed in an act of self-defense, the State submitted evidence that Krasilova was stabbed nine times, had ligature marks around her neck, had multiple signs of strangulation, and suffered other blunt force injuries. Contrary to defendant's offered narrative that Krasilova was stabbed incidentally during the course of a struggle to gain control over a knife, the State's evidence showed that Krasilova suffered multiple deep stab wounds that required significant force and it also showed that she was stabbed in various areas of the body. The use of the term victim was supported by evidence—that Krasilova suffered harm and, further, that the harm was not legally justified.

¶ 51    The evidence of defendant's guilt was strong and, even if we concluded that it was improper for the State to refer to Krasilova as the victim during trial, we would conclude that the error was harmless beyond a reasonable doubt. See *People v. Spicer*, 379 Ill. App. 3d 441, 456 (2007) (an error is harmless if it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained). Beyond the physical evidence, the State presented further evidence that defendant did not act in self-defense. Defendant did not call 911 after stabbing Krasilova, leaving her alone while either dead or dying on her apartment's floor. See *People v. Wrancher*, 2022 IL App (2d) 210134-U, ¶ 100, (appeal denied, 201 N.E.3d 578 (Ill. 2023)) (the defendant's failure to call police showed consciousness of guilt). He lied to his friends, claiming Krasilova stabbed herself without mentioning his involvement in the act. *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 (lying may be considered evidence of consciousness of guilt.) When defendant's friends urged him to contact the police, he refused. He made preparations to flee the country on a one-way ticket to Poland with no intent to return to Chicago. Evidence of flight is admissible as a circumstance tending to show consciousness of guilt. *People v. Harris*, 52 Ill. 2d 558, 561 (1972).

¶ 52    The State's use of the word "victim" was predominately used for identification purposes and was not used for the purpose of eliciting sympathy or inflaming the passions of the jury. The references to Krasilova as "the victim" were not so numerous nor were they made with any emphasis such that the presumption of innocence was undermined, nor was defendant unfairly prejudiced in the eyes of the jury by the use of the term. As we concluded in *DeSavieu*, 120 Ill. App. 3d at 432, the references to Krasilova as the victim during trial did not affect the jury's ability to rationally evaluate the evidence presented. Accordingly, we hold that defendant was not denied a fair trial based on the State's use of the term "victim" and he is not entitled to a new trial on this basis.

¶ 53                          B. Initial Aggressor Jury Instruction

¶ 54    Defendant contends that he was denied a fair trial because the trial court gave the jury the "initial aggressor" pattern jury instruction despite the State failing to submit evidence that defendant initially provoked the physical confrontation with Krasilova. The "initial aggressor" pattern jury instruction states that "[a] person who initially provokes the use of force against himself is justified in the use of force only if: (1) the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and (2) he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person." Illinois Pattern Jury Instructions, Criminal, 24-25.09 (4th ed. 2000). Defendant argues that he was prejudiced by the trial court giving this instruction to the jury because this instruction would require him to attempt to escape before acting in justifiable self-defense while he would not be required to attempt such escape if Krasilova was the initial aggressor. Defendant maintains that without the State offering evidence

that he was the initial aggressor, the court abused its discretion by giving this instruction to the jury.

¶ 55    Defendants have a constitutional right to have the jury properly instructed on the applicable law. *People v. Mitchell*, 221 Ill. App. 3d 979, 985 (1991); *People v. Smith*, 2019 IL App (1st) 161246, ¶ 42. The purpose of jury instructions is to communicate to the jury the correct principles of law relating to the evidence presented at trial to enable the jury to reach a correct conclusion regarding the defendant's guilt or innocence based on the law and evidence. *People v. Nash*, 2012 IL App (1st) 093233, ¶ 26. The decision of whether to give a particular jury instruction is within the sound discretion of the trial court. *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 33. Both parties are entitled to have jury instructions given on their respective theories of the case and, generally, an instruction is warranted if there is even slight evidence to support it. *People v. Miller*, 2021 IL App (1st) 190060, ¶ 44.

¶ 56    Defendant requested and received the instruction about the applicable law for the jury to apply if he was not the initial aggressor. Defendant's requested instruction states that "[a] person *who has not initially provoked* the use of force against himself has no duty to attempt to escape the danger before using force against the aggressor." (Emphasis added). Illinois Pattern Jury Instructions, Criminal, 24-25.09X (4th ed. 2000). In response, the State requested that the jury be instructed on the applicable law to apply if defendant was found to be the initial aggressor. The State requested that the jury also be instructed that "[a] person *who initially provokes the use of force* against himself is justified in the use of force only if: (1) the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and (2) he has exhausted every reasonable means to escape the danger other than the use of force which

19

is likely to cause death or great bodily harm to the other person." (Emphasis added). Illinois Pattern Jury Instructions, Criminal, 24-25.09 (4th ed. 2000).

¶ 57    Defendant's theory of the case was that he was sleeping when Krasilova came home drunk, kicked in the apartment door, and attacked him in a rage. She then came after defendant with a knife, and they struggled over control of the knife until she was stabbed in an act of self-defense. The State's theory of the case was that Krasilova came home and was angry that defendant had locked her out of her apartment. They got into a verbal altercation and then defendant intentionally killed Krasilova without legal justification.

¶ 58    The State did not present any evidence to support its theory that defendant was the initial aggressor in this case. There was no direct evidence that defendant initiated the confrontation with Krasilova that led to her death. The evidence showed that Krasilova came home and was yelling outside of her door before forcing her way inside. Once inside the apartment, there was a verbal confrontation that eventually escalated to Krasilova being killed by defendant. But there is no evidence in the record that defendant was the one to initiate the physical confrontation with Krasilova to provoke the use of force. Defendant's testimony was that Krasilova initiated the hostilities at every step of their confrontation.

¶ 59    The State relies on the testimony of Krasilova's friend that Krasilova always kept the door to her apartment unlocked, and the testimony of Krasilova's neighbor that Krasilova was locked out on the day of the murder. The State argues defendant's act of locking Krasilova out of the apartment is evidence that defendant was the initial aggressor. The State also supports its theory by arguing that the text messages between defendant and Krasilova show that he was angry with her. The text messages are not provocation because mere words, no matter how aggravating or abusive, rarely supply adequate provocation. *People v. Slaughter*, 84 Ill. App. 3d

20

1103, 1112 (1980). Provocation is usually restricted to physical assaults, mutual quarrel or combat, adultery and similar situations. *Id.*

¶ 60    Here, there was no evidence offered at trial that defendant initiated the physical confrontation that ultimately led to Krasilova's death. The only evidence in the case about initial provocation came from defendant, and he testified that it was Krasilova who provoked the use of force. It is error to submit an instruction to the jury when there is no evidence to support it. *People v. Williams*, 168 Ill. App. 3d 896, 902 (1988). The trial court erred when it gave the initial aggressor instruction over defendant's objection when there was no evidence submitted that defendant was the initial aggressor.

¶ 61    However, even though it was inappropriate for the trial court to give the initial aggressor jury instruction here, the error was harmless because, as we stated above, the evidence against defendant was overwhelming. The State submitted evidence that Krasilova was stabbed nine times, had ligature marks around her neck, had multiple signs of strangulation, and suffered other blunt force injuries. Krasilova suffered multiple deep stab wounds that required significant force, and she was stabbed in various areas of the body. These injuries negate defendant's contention that Krasilova was incidentally stabbed during a struggle over the knife. The giving of an erroneous jury instruction error is harmless if the result of the trial would not have been different if a proper instruction had been given. *People v. Mercado*, 333 Ill. App. 3d 994, 1000 (2002). The evidence of defendant's guilt was overwhelming, and the court giving the initial aggressor instruction did not affect the outcome of the trial. Therefore, defendant is not entitled to a new trial on this basis.

¶ 62                                    C. Length of Sentence

¶ 63    Defendant contends that his sentence is excessive because he is a first-time offender with demonstrated rehabilitative qualities and potential. Defendant was sentenced to 33 years in prison for Krasilova's murder, and he argues that the totality of circumstances show that he is entitled to a lesser sentence. He asks us to remand the case for resentencing.

¶ 64    The Illinois Constitution requires all sentences to be determined according to both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I. § 11; *People v. Clemons*, 2012 IL 107821, ¶ 29. "In determining the appropriate sentence, the trial court must carefully consider all the factors in aggravation and mitigation, including, *inter alia,* the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010) (citing *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)). The trial court is afforded broad discretionary powers in imposing a sentence, and a trial court's sentencing decision will not be disturbed on review absent an abuse of discretion. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26.

¶ 65    Defendant acknowledges that his conviction in this case arises from "a serious and violent offense." He acknowledges that he was wrong to flee the United States and to delay the proceedings against him. However, defendant argues that the totality of the record, including his character and background from before and after this incident, demonstrates that the trial court's 33-year sentence defies the constitutional mandate for a just sentence which prioritizes restoring him to useful citizenship.

¶ 66     Defendant highlights that before killing Krasilova, he lived a crime-free life both here and in Poland. He volunteered for charities and held strong bonds with his family and friends. He had no history of violence or aggression. After killing Krasilova, he suffered from posttraumatic stress disorder, depression, and anxiety. He attempted suicide twice. He sought out professional mental health treatment and sought to better himself. He has dreams and goals for his life, and he contends that what happened with Krasilova will not recur. Defendant argues that despite these factors and his potential to live a useful life while not incarcerated, the 33-year sentence that the trial court imposed will keep him in prison until he is in his 60s. He maintains that his punishment is extreme, is expensive for taxpayers, and will condemn him to a life of poverty upon his release because his sentence will likely prevent him from obtaining a pension in Poland. He urges us to remand the case for resentencing.

¶ 67     The sentencing range for defendant's first-degree murder conviction is a sentence from of 20 to 60 years in prison. (730 ILCS 5/5-4.5-20(a) (West 2020)). When a trial court imposes a sentence within the applicable sentencing range, the sentence is presumptively proper. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105. When a sentence is imposed that is within the sentencing range, the sentence will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 34. Here, defendant was given a sentence in the middle part of the applicable range. He does not demonstrate on appeal that the sentence was manifestly disproportionate to the nature of the offense.

¶ 68     The conduct giving rise to defendant's conviction was very serious. The evidence at trial showed that defendant killed someone who was supposed to be his best friend by stabbing her nine times and strangling her. Defendant then left his friend either dead or dying on her

apartment floor without calling for an ambulance. He made jokes about what he should do with the victim's dead body. Defendant took the weapon he used to kill the victim and concealed it so authorities would not find it. Defendant then fled the country under false pretenses and without speaking to police. He did not return to the United States for six years, until he was extradited here from Poland.

¶ 69    The trial court concluded that four words came to mind when thinking about defendant's actions in this case: brutal, violent, callous, and selfish. The trial court recounted the physical evidence of the crime and defendant's actions after the killing to support its finding that defendant's actions were extreme. The trial court expressly noted its consideration of defendant's lack of a criminal history and certain other mitigating considerations, such as defendant's low likelihood to re-offend in this manner in the future. In weighing both sides of the equation, the trial court determined that 33 years in prison was the appropriate sentence.

¶ 70    Defendant's arguments about his sentencing on appeal essentially ask us to reweigh the evidence presented to the trial court and reach a different conclusion. On appeal, we do not reweigh the evidence that the trial court considered when delivering a sentence. *People v. Jones*, 2015 IL App (1st) 142597, ¶ 40. The reviewing court may not reverse a trial court's sentencing decisions just because it may have weighed the relevant factors differently or arrived at a different conclusion. *Id.* at ¶ 39. Defendant has not demonstrated that the sentence fashioned by the trial court was manifestly disproportionate to the nature of the offense or greatly at variance with the spirit and purpose of the law and, therefore, he has not shown the trial court abused its discretion when sentencing him.

¶ 71                                  CONCLUSION

¶ 72    Accordingly, we affirm.

¶ 73    Affirmed.

¶ 74    JUSTICE ELLIS, specially concurring:

¶ 75    I would find error in the references at trial to the decedent as the "victim." The majority avoids a final determination of error, noting that the frequency and context in which that term was used by the witnesses shows that the term was not used to inflame the jurors' passions or prejudices, and the evidence, in any event, was more than sufficient to overcome any prejudicial impact. Thus, says the majority, even if error occurred, it would not warrant a new trial.

¶ 76    I agree with the majority on those points, which is why I concur in the judgment of affirmance. But I would decide the question of error and find that error unquestionably occurred. I would reach that question principally because the issue is not one defendant makes in hindsight but one that he raised pretrial. Defendant moved *in limine* to prevent the use of the term "victim" to refer to the decedent, and the trial court denied that motion. There is absolutely no reason why that motion *in limine* should have been denied.

¶ 77    In most criminal cases, the question of whether the decedent (or surviving complainant) was the "victim" is not a question at all; the only issue is whether the defendant was the perpetrator of the offense. So while some defendants may complain about that term's use because it plays to the jurors' sympathy, as a factual matter it is an undisputed description of the complainant.

¶ 78    But a case involving self-defense, as here, is different. A self-defense case rises and falls on the interaction between the defendant and decedent. Calling the decedent a "victim" unequivocally paints the decedent in a sympathetic light vis-à-vis the defendant, in a case where the comparative culpability between the two actors is the very question—indeed, the only question—at issue.

¶ 79     So unlike other criminal cases, where the complaint is that the term "victim" inflames juror passions, the problem here is that calling the decedent a "victim" assumes a fact (or least a characterization) about the decedent that the defendant vigorously disputes. A defendant pleading self-defense is claiming that he was compelled, by imminent threat of death or great bodily harm *caused by the decedent*, to act with deadly force against the decedent.  The defendant is saying that the decedent is anything *but* a "victim."

¶ 80     That term should not be used by anyone—lawyers, witnesses, judges—during opening statements or the presentation of evidence. Closing argument may be a different story, but here, the term was used multiple times by witnesses for the State.

¶ 81     There is scant case law directly deciding this question. Cases that do not involve self-defense are beside the point. As is the recent *Cruz* decision, where it was the *jury* who wrote a note asking to re-watch video footage of the defendant lunging at the "victim." *Cruz*, 2021 IL App (1st) 190132, ¶ 70. All the court did was show the video; the court in no way endorsed the "victim" characterization, particularly given that it was obvious to whom the jury was referring—there was only one person at whom the defendant lunged in the video.

¶ 82     The majority cites *People v. Hurley*, 2022 IL App (1st) 200650-U, ¶ 50, an unpublished decision where this court held that it was not error to refer to the decedent as a "victim." The court there reasoned that many criminal statutes use the term "victim." *Id*. I'm not sure why that would matter, but even if it did, it does not follow that witnesses and prosecutors and judges should use that term in a trial involving self-defense. If we are going to cite sources, I would cite the more specific and directly applicable Illinois Pattern Jury Instructions regarding self-defense, which never *once* refer to the complaining witness as a "victim." The pattern instructions— literally the way our supreme court directs the trial court to describe the law to the jury—strike

me as a much higher authority than some statute defining the elements of a crime. I would not follow *Hurley*'s reasoning or holding on this point.

¶ 83     It may often be the case, even in a self-defense trial, that an occasional, casual reference to "victim" to describe the decedent is not enough to warrant a new trial. This case is an example, as the majority holds. But we should take this opportunity to set the law straight on this topic. The term "victim" should not be used to describe the decedent or complainant in a self-defense case. And if the defense moves pretrial to bar the use of that term, as here, that motion should be granted.